712 F.2d 1241
 32 Fair Empl.Prac.Cas. (BNA) 609,
32 Empl. Prac. Dec. P 33,730,
13 Fed. R. Evid. Serv. 1453
Betty J. BLOCK, Appellee-Plaintiff,
v.
R.H. MACY & COMPANY, INC., Appellant-Defendant.
 No. 81-2382.
 United States Court of Appeals,
Eighth Circuit.
 Argued June 15, 1982.
Decided July 19, 1983.
 
 Eldon J. Shields, Overland Park, Kan., C. Brooks Wood, Kansas City, Mo., for appellee-plaintiff Block; McDonald & Dykes, Overland Park, Kan., Jackson, Dillard, Brouillette & Farchmin, Kansas City, Mo., of counsel.
 Frank B.W. McCollum, William C. Martucci, Kansas City, Mo., for appellant-defendant R.H. Macy & Co., Inc.; Spencer, Fane, Britt & Browne, Kansas City, Mo., of counsel.
 Before LAY, Chief Judge, JOHN R. GIBSON, Circuit Judge, and FAIRCHILD, Senior Circuit Judge*.
 FAIRCHILD, Senior Circuit Judge.
 
 
 1
 Betty Block brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and under 42 U.S.C. § 1981. She claimed that her discharge from employment with the defendant resulted from racial discrimination. The jury returned a verdict in her favor in the § 1981 action, and awarded $20,000 in compensatory damages and $60,000 in punitive damages. The district court (a magistrate presiding with the parties' consent) made findings in plaintiff's favor on the Title VII cause of action.[1]
 
 
 2
 Although there were conflicts on some points, there was evidence to support the findings of the district court, and the jury considered the same evidence. The court found that Betty Block is a black woman the defendant employed as a sales associate from 1965 to 1976. Her performance was rated good or very good. Rosemary Ancona, a white woman, was a buyer for defendant in the department where plaintiff worked. Ancona openly manifested racial bias against blacks in a number of ways and on several occasions. This included racially offensive references to plaintiff, another employee, and customers.
 
 
 3
 On June 9, 1976, Ancona came to plaintiff's work location, criticized her work and attitude, was the first of the two to use street language, and wound up with what seems to be a threat, "I am going to get you down from here if that is the last thing I do."
 
 
 4
 Ancona then went to the personnel executives at the store to report the incident and told them she wanted plaintiff "out of there." Ancona, and other employees present were asked to put their reports in writing. They did so the next day. Ancona and one of the others attributed to Betty Block a remark which could be interpreted as a threat.
 
 
 5
 Personnel executives, without contacting plaintiff, decided to discharge her, called her in, and told her of the discharge. She was not asked for her version of the incident.
 
 
 6
 In stating his conclusion, the district court discussed the requirements of proof, and then wrote:
 
 
 7
 She has adduced convincing and compelling testimony to demonstrate that Rosemary Ancona, the executive upon whose report and recommendation personnel executives primarily relied, was racially biased and that this bias motivated her recommendation. Moreover, plaintiff presented sufficient evidence to show that Ancona's racial bias, and indeed her ill feeling toward plaintiff, was known to defendant's supervisory personnel. Despite these circumstances, defendant did not seek an explanation from plaintiff of the incident which led to the discharge decision. Moreover, plaintiff also offered evidence that conflicts and arguments between buyers and sales associates were not unusual and that they did not lead to disciplinary action. Indeed, plaintiff offered evidence of a specific incident in which two white employees, one a supervisor and the other a sales associate, confronted one another in similar circumstances. No disciplinary action was taken against either. In short, while plaintiff may not have proven that the impermissible racial discrimination was the sole factor in defendant's decision to discharge her, she convincingly demonstrated that it was a contributing factor. See Coleman v. Missouri Pacific Railroad Company, 622 F.2d 408, 410 (8th Cir.1980). Thus, based upon the evidence at trial, when taken as a whole, it is clear that plaintiff has carried her burden of proof by showing that defendant intentionally discriminated against her because of her race and that this discrimination led to her discharge from defendant's employment.
 
 
 8
 On appeal the defendant does not dispute the sufficiency of the evidence on liability, but argues: (1) that the court erred by excluding evidence of plaintiff's post-discharge assault on Rosemary Ancona; (2) that the record does not contain sufficient evidence to support the jury award for mental anguish, humiliation, and embarrassment; (3) and that the record does not support an award of punitive damages.
 
 
 9
 I. The Exclusion of Evidence of the Post-Discharge Assault
 
 
 10
 Defendant's personnel executives testified that they made the decision to discharge the plaintiff because they determined that on June 9, 1976 she had: (1) made a threat of bodily harm to Ancona; (2) used improper language on the sales floor during the work day; and (3) failed to comply with a direct order from a superior.
 
 
 11
 Although Ancona did not testify, there was testimony which would have supported the version of the incident as she reported it, and a finding that Ancona genuinely believed that she had been threatened. On the other hand there was proof which the jury evidently believed that the conversation was far less threatening than reported by Ancona; that the conversation occurred as described in the court's findings; that Ancona was racially biased against plaintiff, wanted her replaced by a white employee, told the personnel people she wanted plaintiff fired, and that the personnel executives acceded to her request notwithstanding their knowledge of her racial bias. They did not give plaintiff an opportunity to tell her version, in violation of defendant's rule requiring advance notice and a termination interview.
 
 
 12
 Defendant offered to prove that several hours after plaintiff was discharged she came into Ancona's office, hit Ancona three times with an umbrella, with sufficient force to leave marks, and called her a name. The court excluded the testimony, saying, "the umbrella incident is so utterly prejudicial with such minimal probative value that I am not going to allow testimony in front of the jury."
 
 
 13
 Defendant would argue that the assault showed plaintiff to be capable of violence toward Ancona and therefore made it more probable that her language the day before was a seriously intended threat; that the evidence would tend to persuade the jury that Ancona's report and the personnel executives' reaction to it (including their decision not to interview Block) were reasonable. On the other hand, the discharge was an intervening event, presumably provoking the assault and thus reducing the value of the post-discharge violence as evidence of Block's attitude at the time of the altercation the day before. The danger that the jury would react against her for seeking a remedy by violence is apparent.
 
 
 14
 The court made it clear that he weighed the probative value against the danger of unfair prejudice and that he decided that the danger of unfair prejudice substantially outweighed the probative value. This is the proper test under Rule 403, Federal Rules of Evidence.
 
 
 15
 As stated in the Rule 403 Note of the Advisory Committee, " 'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."
 
 
 16
 Rule 403 authorizes exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Consistent with the requirement that the overbalance must be substantial, we have said: "In weighing the probative value of evidence against the dangers and considerations enumerated in Rule 403, the general rule is that the balance should be struck in favor of admission. United States v. Day, 591 F.2d 861, 878 (D.C.Cir.1978), citing C. McCormick, Evidence 453 n. 55 (2d ed. 1972)." United States v. Dennis, 625 F.2d 782, 797 (8th Cir.1980).
 
 
 17
 In reviewing a ruling under Rule 403, the appellate court must give great deference to the trial judge who saw and heard the evidence. United States v. Dennis, supra, 625 F.2d at 796. The judge has wide discretion in performing his function under that rule, and his decisions thereon will not be disturbed unless there be a clear abuse of discretion. E.I. DuPont de Nemours v. Berkley & Co., 620 F.2d 1247, 1272 (8th Cir.1980).
 
 
 18
 We find no abuse of discretion here.
 
 II. Evidence of Mental Distress
 
 19
 The jury awarded compensatory damages of $20,000. It follows from the instructions that this sum included a stipulated wage loss of $7,598, and thus $12,402 for "mental anguish, humiliation, embarrassment and stress."
 
 
 20
 Defendant apparently concedes that plaintiff in a § 1981 action may recover compensatory damages for emotional distress and humiliation. See Williams v. Trans World Airlines, 660 F.2d 1267, 1272 (8th Cir.1981);[2] Smith v. Anchor Building Corp., 536 F.2d 231, 236 (8th Cir.1976). Defendant argues that the evidence does not support the award.
 
 
 21
 Because of the difficulty of evaluating the emotional injuries which result from deprivations of civil rights, courts do not demand precise proof to support a reasonable award of damages for such injuries. Williams, 660 F.2d at 1272 (damages for emotional harm presumed from infringement of substantive constitutional right); Smith, 536 F.2d at 236 (humiliation or mental distress established by plaintiff's own testimony); Seaton v. Sky Realty Co., 491 F.2d 634, 636 (7th Cir.1974) (humiliation inferred from the circumstances). See Phillips v. Hunter Trails Community Association, 685 F.2d 184, 190 (7th Cir.1982). See also Carey v. Piphus, 435 U.S. 247, 267 n. 25, 98 S.Ct. 1042, 1054 n. 25, 55 L.Ed.2d 252 (1978).
 
 
 22
 There was evidence that at the confrontation earlier referred to, Ancona loudly berated plaintiff in street language in the presence of one customer and two other employees,[3] and that plaintiff had never heard Ancona address a white person in a similar manner. The next day plaintiff was summoned before the personnel manager who told her she was terminated because Ancona said plaintiff had threatened Ancona. Plaintiff cried and felt angry with Ancona.
 
 
 23
 In denying defendant's motion for remittitur, the district court wrote:
 
 
 24
 By her direct testimony, plaintiff established that following her discharge she was unable to obtain other employment for a substantial period of time [some 13 months]; that she was forced to borrow money from relatives in order to sustain her family during that period; and that as a result of her financial dilemma, she suffered sleeplessness, anxiety, embarrassment and depression.
 
 
 25
 The jury had the benefit of observation of plaintiff in considering and determining a fair allowance for her emotional distress and humiliation. Its award strikes us as very close to the maximum which could be deemed reasonable on this evidence, but we are not able to say with confidence that it is excessive.
 
 III. Punitive Damages
 
 26
 The court instructed the jury that in establishing a claim under § 1981, plaintiff had the burden of proving that defendant intentionally discriminated against her on the basis of race with respect to her discharge. The jury's verdict must accordingly mean that the jury found intentional discrimination on the basis of race. Since the trial of this case it has been decided "that § 1981 ... can be violated only by purposeful discrimination." General Building Contractors Association v. Pennsylvania, 458 U.S. 375, ----, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). Defendant does not challenge the sufficiency of the evidence to support the finding of liability and award of compensatory damages.
 
 
 27
 The court also explained the possibility of awarding punitive damages in addition to compensatory damages. It instructed that such an award could be made if the jury found that the defendant's act or omission was "maliciously or wantonly or oppressively done." It also instructed that an Act is "wantonly" done if done "in reckless or callous disregard of, or indifference to, the rights" of plaintiff.
 
 
 28
 The Supreme Court has very recently held "that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, --- U.S. ----, ----, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The Court also rejected an argument that "the deterrent and punitive purposes of punitive damages are served only if the threshold for punitive damages is higher in every case than the underlying standard for liability in the first instance." --- U.S. at ----, 103 S.Ct. at 1638.
 
 
 29
 The Court also commented that punitive damages "are never awarded as of right, no matter how egregious the defendant's conduct." To make a punitive award, the jury must not only find that the defendant's conduct in fact met the threshold requirement, "but also that his conduct merited a punitive award (a discretionary moral judgment)." Ibid.
 
 
 30
 Although Smith was a § 1983 action, we think that the principles there applied must also govern punitive damages in a § 1981 action.
 
 
 31
 We are aware of the qualification appearing in the statement of the Supreme Court that one who establishes a cause of action under § 1981 is entitled to punitive damages "under certain circumstances." Johnson v. Railway Express Agency, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). The quoted phrase may have meant no more than that punitive damages need not always be awarded. The choice of language was made before the decision in General Building Contractors Association, supra, that purposeful discrimination is essential to § 1981 liability, and also before Smith.
 
 
 32
 On the merits defendant had hoped to convince the jury that Ancona had reported plaintiff out of genuine fear of threat and not because of racial bias. Failing that, it sought acceptance of the proposition that the personnel officers acted independently, reasonably evaluated Ancona's report as showing serious misconduct, and discharged plaintiff without any racial motivation. Hopefully, then, even if the jury had thought Ancona motivated by racial bias, the jury would not have imputed her intent to defendant, and would not have awarded compensatory damages. The jury obviously rejected the analyses sponsored by defendant.
 
 
 33
 Defendant argues that it is not appropriate to award punitive damages against a corporate defendant in the absence of evidence "that the executive decision makers were racially motivated or biased."
 
 
 34
 Defendant relies upon Lake Shore & c. Railway Co. v. Prentice, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893), and on Emmke v. DeSilva, 293 F. 17, 22 (8th Cir.1923) (relying on Prentice). In Prentice, a pre-Erie diversity case, the Court noted a "distinction between imputing to the corporation such wrongful act and intent as would render it liable to make compensation to the person injured, and imputing to the corporation the intent necessary to be established in order to subject it to exemplary damages by way of punishment." 147 U.S. at 117, 13 S.Ct. at 266. The Court held that an award of punitive damages against the corporation cannot be predicated upon wanton, oppressive, or malicious intent upon the part of its agent unless it be shown that the corporation knew of the agent's unsuitability or in some way participated in, approved, or ratified the agent's conduct.
 
 
 35
 A recent comment by the Supreme Court suggests some question whether Prentice would presently govern corporate liability for punitive damages under § 1981. "A majority of courts, however, have held corporations liable for punitive damages imposed because of acts of their agents, in the absence of approval or ratification.... In fact, the Court may have departed from the trend of late nineteenth century decisions when it issued [Prentice], requiring the principal's participation, approval, or ratification." American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556, 557 n. 14, 102 S.Ct. 1935, 1947 n. 14, 72 L.Ed.2d 330 (1982).
 
 
 36
 Although Prentice spoke of equating the intent of the very highest executive officers with that of the corporation, 147 U.S. at 114, 13 S.Ct. at 265, the Restatement would permit focus for this purpose on any "managerial agent." Restatement, Torts Second § 909.
 
 
 37
 Defendant appears to concede that the three personnel officers were sufficiently managerial representatives of the corporation so that their intent could be imputed to it for the purpose of punitive damages. One of them held the title of Vice President for Personnel, Missouri-Kansas Division. We could consider them, collectively, a "managerial agent."
 
 
 38
 Purposeful racial discrimination (as well as reckless indifference to the rights of plaintiff) on the part of the three personnel officers could reasonably be inferred. They knew of Ancona's racial bias. In one incident Ancona loudly used racial epithets, sufficiently to cause comment by customers. The store security officer was called and spoke with her. She was not otherwise disciplined. There was evidence that the personnel officers did not act with complete independence in the role of decision makers considering a complaint, but gave weight to Ancona's request for plaintiff's discharge.
 
 
 39
 Knowing of Ancona's bias, they did not ask plaintiff for her version of Ancona's claim, nor did they ask plaintiff's immediate supervisor for her views. There had been a similar incident involving two white employees, neither of whom had been disciplined. After plaintiff was discharged, a personnel officer told an employee not to tell anyone about the earlier incident. Plaintiff's immediate permanent replacement was white, although black women were later hired as sales associates.
 
 
 40
 Assuming, as contended by defendant, that the proper focus is on the mental attitude of the three personnel officers, we think there was support for the award of punitive damages.
 
 
 41
 The defendant asserts that a finding of racial discrimination under § 1981 does not, in and of itself, justify an award of punitive damages. In support of this argument it cites: Steele v. Title Realty Co., 478 F.2d 380, 384-85 (10th Cir.1973); Lindsey v. Angelica Corp., 508 F.Supp. 363, 367 (E.D.Mo.1981); Mosley v. General Motors Corp., 497 F.Supp. 583, 590 (E.D.Mo.1980); Taylor v. Jones, 495 F.Supp. 1285 (E.D.Ark.1980), modified, 653 F.2d 1193 (8th Cir.1981); Tillman v. Wheaton-Haven Recreation Association, 367 F.Supp. 860 (D.Md.1973), rev'd on other grounds, 517 F.2d 1141 (4th Cir.1975). All four district court cases were tried without a jury. Therefore the judges were the triers of fact and had discretion not to impose punitive damages. Lindsey, Mosley, and Taylor do not state a rule that only a discernable quantum of malice beyond the forbidden purpose required for liability can justify an award of punitive damages under § 1981. Tillman found no merit in the contention 'that inherent in the nature of racial discrimination is an element of "malice" or "wantonness." ' 367 F.Supp. at 864. Steele, the only appellate court case cited by the defendant, involved the Fair Housing Act, 42 U.S.C. §§ 3604 and 3612 (1970), not § 1981. Steele in disallowing a district court's award of punitive damages observed that the racially discriminatory refusal to rent was not motivated by ill will, malice, or a desire to injure, but by pressure from others. 478 F.2d at 384-85. All of these cases were decided prior to the Supreme Court's definitive statement in General Building Contractors that only purposeful discrimination violates § 1981,[4] 458 U.S. at ---, 102 S.Ct. at 3150, and prior to the Court's rejection in Smith of the claim that the threshold for punitive damages must be higher than the underlying standard for liability. --- U.S. at ---, 103 S.Ct. 1640. We do not view the earlier decisions relied on by defendant as requiring rejection of the punitive award in this case.
 
 
 42
 In the alternative, defendant suggests that we reduce the punitive damages. "The amount of the punitive award lies in the discretion of the jury and may only be disturbed when it appears, in the judgment of the reviewing court, to be unfair and shocking." Guzman v. Western State Bank, 540 F.2d 948, 954 (8th Cir.1976). In the light of this rule, we find no basis for our changing the amount.
 
 
 43
 The judgment appealed from is AFFIRMED.
 
 
 
 *
 Of the United States Court of Appeals for the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 On the Title VII claim the court awarded $7,598 for backpay, the amount stipulated by the parties. The compensatory damages awarded on the § 1981 claim included the same amount of backpay and the judgment entered reflected only the jury award
 After trial the court denied the defendant's motions for judgment notwithstanding the verdict on the § 1981 claim and for remittitur of the jury award for compensatory and punitive damages.
 
 
 [2]
 The holding has been questioned under Title VII, but not under § 1981. Walker v. Ford Motor Co., 684 F.2d 1355, 1364 n. 14 (11th Cir.1982)
 
 
 [3]
 There was a conflict in the evidence, but the jury and the magistrate believed the plaintiff
 
 
 [4]
 We note that when we held "[e]ffect, not motivation, ... the touchstone" for discrimination we found punitive damages inappropriate in a case involving § 1981 although the plaintiff had established an unrebutted case of racial discrimination in housing. Smith v. Anchor Building Corp., 536 F.2d 231, 233, 236 (8th Cir.1976)