Jimmie **WILMINGTON**, Appellee,

v.

**J.I. CASE COMPANY**, Appellant.

Jimmie **WILMINGTON**, Appellee,

v.

**J.I. CASE COMPANY**, Appellant.

Nos. 85–1615, 85–1939.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 10, 1986.

Decided June 9, 1986.

A. Yes.

Q. And he then is required to write out in his own hand some statement of what the informant told him, right?

A. Yes.

A. Yes.

David J. Parsons, Chicago, Ill., for appellant.

Walter D. Braud, Rock Island, Ill., for appellee.

Before HEANEY and BOWMAN, Circuit Judges, and TIMBERS,* Senior Circuit Judge.

* The HONORABLE WILLIAM H. TIMBERS, Senior United States Circuit Judge for the Second Circuit, sitting by designation.

BOWMAN, Circuit Judge.

J.I. Case Company (Case) appeals from the judgment entered on the jury's verdict for plaintiff Jimmie Wilmington in this 42 U.S.C. § 1981 civil rights suit. The jury found that Case intentionally subjected Wilmington, a former employee, to discriminatory terms and conditions of employment because of his race, and that Case intentionally discharged him because of his race. The jury awarded Wilmington $400,000 in actual damages and $40,000 in punitive damages. The District Court [1] denied Case's post-trial motions for judgment notwithstanding the verdict, a new trial, or remittitur of damages, and entered judgment for Wilmington. The court further awarded Wilmington $35,721.25 in attorneys' fees under 42 U.S.C. § 1988, and $5,575.08 in costs for his expert witness under 28 U.S.C. § 1920. We affirm the District Court's judgment with the direction that the attorneys' fee award is to be applied toward the amount due Wilmington's attorneys under their contingent fee agreement, not in addition to the amount due under that agreement.

## I.

Wilmington began working in Case's Bettendorf, Iowa farm implement manufacturing plant in 1972. After attending in-house training, he became a welder in Department 895 and welded parts used in tractor cabs. His primary assignment was to weld the cab frame structural posts forming the forward right and left corners of the cab enclosure. From 1979 until his discharge on August 31, 1981, his supervisor was a white foreman named Clyde Krupa, who in turn reported to a white general foreman named John Carson. Wilmington was one of about six black welders in Department 895 and the only black welder of the thirty-five welders under Krupa's supervision.

Welders could earn incentive pay by producing welded parts in less time than the standard set for that task. From 1979

1. The Honorable Harold D. Vietor, Chief Judge for the Southern District of Iowa.

through at least August 1981, the standard for Wilmington's job was 100 posts in 6.107 hours. If he welded 100 posts in less than 6.107 hours, he earned incentive pay. Otherwise, he earned the base rate for his labor grade. To determine which employees were entitled to incentive pay, Case relied primarily on the honor system. All welders were required to report their productivity each day by submitting a labor card listing part number, hours worked, and number of parts welded. The foremen regularly conducted audits to check each employee's honesty. These audits consisted of counting the audited employee's completed pieces throughout the day.

Many welders would produce pieces in excess of what they reported and hold them over to apply them to their total for another day to earn incentive pay. This accumulation of finished but unreported pieces was called a "kitty." Such kitties commonly existed despite company prohibitions and without management awareness because Case had few inventory control records once the unwelded parts were brought from storage to the plant floor. A record was made when parts were delivered to the "in" temporary storage space on the plant floor. From that point on, the only written records of how the parts progressed through the production process were the labor cards that employees submitted. Although a lift truck operator usually delivered the parts to the welders as needed, the welders sometimes took the parts from "in" storage themselves. The lift truck operator did not record how many posts he delivered to Wilmington on any particular day, or how many Wilmington took from "in" storage. Nor did the employees who ground Wilmington's welds keep track of how many posts they received from him at any particular time. When a grinder sent the posts to the subassembly line, again no one recorded the move.

The existence of a kitty and periodic shipments of welded posts from Wilmington's

booth to the grinder made it difficult to establish a correct count of how many posts Wilmington produced within any particular time frame. For example, one might count twenty welded posts on the pallet near his booth at time X and an hour later find twenty-five welded posts, indicating five more posts had been welded. In the interim, however, the twenty posts could have been sent to the grinder, and twenty-five more welded.[2] The actual count might be forty-five, although it would look as if only twenty-five had been completed. Thus, unless one watched as Wilmington welded each post, the counting was complicated.

Wilmington's welding ability, according to the testimony at trial and as reflected in Case's records, was remarkable. Before Case raised the standard to 100 posts in 6.107 hours, Wilmington regularly exceeded Case's production standards by three or four hundred percent. Concurrent with the implementation of the 6.107 standard, he received a "buy-out" cash bonus to compensate him for the new, more stringent standard. The bonus, based on his prior productivity, was the highest of any incentive worker in the plant. Moreover, after the standard was implemented, he regularly produced 100 welded posts in about four hours, for efficiency ratings averaging 150 percent. His speed was attributable in part to an innovation he devised which reduced the number of clamps needed to hold the post in place during welding from thirteen to one. He also increased his efficiency by completing one particular weld on a large batch of posts before beginning the other welds. According to his testimony, he completed this preliminary task each morning before his official starting time.

Despite Wilmington's proficiency, during his employment at Case he received a variety of disciplinary warnings for violating company rules, some of which resulted in suspensions from work. His supervisors regularly cited him for not wearing his safety glasses, for being out of his work

---

**2.** Testimony at trial indicated that Wilmington could weld about sixty posts each hour, though his normal, sustained rate was about twenty-five.

area (eventually resulting in a one-day suspension), for excessive absences, for a fight with another employee (seven-day suspension), for loitering, for destruction of a company sign (three-day suspension), and for parking improperly in the company lot. His performance evaluations reflect some of these problems; however, many of them were typical of a fair number of the other employees. Wilmington filed several grievances concerning the discipline he received, all of which were resolved in favor of Case. In addition, on September 29, 1980, he filed a grievance alleging that Krupa had discriminated against him on the basis of race, and on June 17, 1981, about two months before Case discharged him, he filed a discrimination complaint with the Iowa Civil Rights Commission.

The events leading to Wilmington's discharge focus on the week of August 17, 1981, which was the first week of production after the plant's annual one month shutdown for inventory. Krupa decided to audit Wilmington that week and passed by his booth periodically each day as well as at the end of the shift to count Wilmington's posts. Krupa's totals day by day were 50, 0, 50, 100, and 44, for a total of 244. Wilmington's labor cards reflected daily totals of 100, 0, 100, —, and 44, for a total of 244. He did not submit a labor card for Thursday because he claimed he did not weld due to a broken machine. Because the daily variances between Wilmington's cards and Krupa's counts affected the amount of incentive pay Wilmington received, he would have earned about $39 more under his count than under Krupa's. Although the dollar amount was not large, Case considered the alleged falsification of labor cards a serious breach of company rules. Case indefinitely suspended Wilmington on August 23, 1981.

One week later, Case fired Wilmington despite the union's efforts on his behalf. The union had conducted its own count of posts welded that week and reached a total

for Wilmington of 244 or 245. The union filed two grievances for him, one contesting whether there was just cause for Case to fire him, and the other alleging racial discrimination. Only the just cause grievance was arbitrated and the arbitrator found that Case had just cause to fire Wilmington because he had falsified his labor cards.

After his discharge, Wilmington filed this suit alleging racial discrimination in violation of 42 U.S.C. § 1981. In his complaint, Wilmington claims that Case followed a pattern and practice of discrimination based on race which adversely affected his status as employee and which denied him equal opportunities for increased pay, promotion, or other advancement. In addition, he claims that during his employment Case intentionally subjected him, because of his race, to different terms and conditions of employment concerning the discipline administered for infraction of company rules. He also claims that Case intentionally discharged him on the basis of his race.[3] The case was tried to a jury, which found in Wilmington's favor and awarded him substantial damages. The District Court denied Case's post-trial motions and entered judgment on the jury verdict. Case appeals from that judgment, raising thirteen points of error, which we group into several categories for the purposes of discussion.

## II.

Case first claims that the District Court erred in not granting a j.n.o.v. or a new trial on the basis that the evidence is not sufficient to support the jury's verdict. Our analysis of this issue is based on a careful review of all the evidence presented at trial in light of our determination, as discussed below, that the District Court did not err in its rulings on the admissibility of evidence.

**3.** The complaint initially stated claims relative to a class action, but it is unclear from the Designated Record whether Wilmington failed to file a motion for class certification or the

District Court denied the motion. In any event, the case did not proceed to trial as a class action.

Because the jury's role is to evaluate and weigh the evidence, *Sanders v. St. Louis County,* 724 F.2d 665, 668 (8th Cir.1983), we must view the evidence in the light most favorable to the prevailing party. Our inquiry is limited to deciding whether a jury reasonably could find that Case discriminated against Wilmington on the basis of race, considering Wilmington's evidence and all reasonable inferences drawn therefrom to be true. We will overturn the jury's verdict only if " 'the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining' " Wilmington's position. *Zoll v. Eastern Allamakee Community School District,* 588 F.2d 246, 250 (8th Cir.1978) (emphasis in original) (quoting *Giordano v. Lee,* 434 F.2d 1227, 1231 (8th Cir.1970)). However, there must be more than a mere scintilla of evidence supporting the verdict for the prevailing party. *Sanders,* 724 F.2d at 668; *see Singer Co. v. E.I. du Pont de Nemours & Co.,* 579 F.2d 433, 440 (8th Cir.1978).

Section 1981 affords a federal remedy against race discrimination in private employment. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 285, 96 S.Ct. 2574, 2581, 49 L.Ed.2d 493 (1976). The order and allocation of proof set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–06, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973), apply to an action brought under section 1981. *Walker v. International Business Machines Corp.,* 698 F.2d 959, 961 (8th Cir.1983). Based on *McDonnell Douglas* and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093 67 L.Ed.2d 207 (1981), the plaintiff first must establish by a preponderance of the evidence a prima facie case of discrimination. The employer then has the burden of articulating some legitimate, nondiscriminatory reason for its adverse treatment of the plaintiff. Finally, the plaintiff has the ultimate burden of proving that the employer's articulated reason was a pretext for discrimination.

Wilmington asserted at trial that Case intentionally discriminated against him by discharging him because of his race. To establish a prima facie case, Wilmington had to show that he is a member of a protected class, that he was capable of performing the work, and that he was discharged. *Smith,* 770 F.2d at 722 n.2; *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1253 (8th Cir.1981). Wilmington clearly proved the three requisite elements: he is black and therefore a member of a protected class, he was capable of performing his job, and Case discharged him.

■ Case denied that Wilmington was treated in a disparate manner prior to his discharge, and articulated a nondiscriminatory reason for the discharge: it believed that Wilmington had falsified his labor cards. The record, however, reveals sufficient evidence to present a jury question on the ultimate issue of whether the articulated reason was pretextual. The evidence clearly does not point solely in Case's favor concerning the discharge; rather it is susceptible of many reasonable inferences sustaining Wilmington's position. The record indicates that Wilmington returned after the annual inventory to find either that his welding booth had been moved or that a grinder now was stationed close to him.[4] Some delay in starting work occurred on Monday, August 17, while the union found a screen to protect him from the grinding splatter. According to Wilmington's testimony and his time and labor cards, he welded 100 posts on Monday, was absent Tuesday, welded 100 posts on Wednesday, was on down time Thursday due to a broken welding machine or gun, and welded 44 posts on Friday before taking a partial day off. Although he turned in his time and labor cards late in the week rather than daily as required, he submitted cards for

---

4. Case could not pinpoint when this change occurred, but Wilmington and others asserted it happened during the inventory shutdown. The easiest time to make the change would have been during the inventory, but in any event the change occurred shortly before or during the shutdown, and almost certainly after Wilmington's complaint was filed with the Iowa Civil Rights Commission.

every day but Thursday, for which he never turned in a card. His total for the week was 244 posts. The evidence showed his usual daily production was about 100 posts. Krupa's audit, on the other hand, showed that Wilmington welded 244 posts, but in a pattern of 50, 0, 50, 100, and 44. Wilmington's count would have increased the amount of incentive pay he earned.

The special verdict shows the jury believed Wilmington's version of his productivity during the week in question.[5] Moreover, the verdict shows the jury believed that Wilmington was the victim of intentional discrimination because of his race. Viewing the evidence in the light most favorable to Wilmington, we conclude that the District Court was correct in denying Case's motions to set aside the jury verdict. There was ample evidence from which the jury could conclude that Case's audit was incorrect and that Wilmington had welded the posts he claimed on his labor card on the days in question, and that in any event this purported justification for discharging Wilmington was a mere pretext for racial discrimination.

Wilmington also claimed at trial that from at least 1979 through August 1981, foreman Krupa, general foreman Carson, and Industrial Relations Manager Robert Lacke intentionally discriminated against him on the basis of race in the terms and conditions of his employment. According to Wilmington, this discrimination consisted of disparities in job assignments and discipline. To establish a prima facie case, Wilmington had to show that he is a member of a protected class, that he was disciplined, and that the discipline imposed was harsher than that imposed on comparably situated whites. *Mosley v. General Motors Corp.*, 497 F.Supp. 583, 589 (E.D.Mo. 1980), *aff'd mem. & remanded*, 691 F.2d 504 (8th Cir.1982). Precise equivalence in culpability between employees is not re-

quired. The acts need only be of comparable seriousness. *McDonald*, 427 U.S. at 283 n. 11, 96 S.Ct. at 2580 n. 11.

Our review of the evidence convinces us that Wilmington also established all three of these prerequisites and thus made out a prima facie case. Case articulated legitimate reasons for its discipline of Wilmington, but Wilmington's evidence was sufficient to permit a jury finding that he was the victim of racial discrimination. The evidence tended to show that Krupa assigned him to undesirable jobs so that he would not earn incentive pay, but rarely so assigned white welders; that Krupa applied the work rules concerning being out of one's work area to Wilmington more strictly than he applied them to white welders; that Krupa repeatedly verbally reprimanded him for being out of his work area when he was out of his booth to get tools or supplies, as well as when he had no reason to be out of his booth, but whites also out of their work areas were not reprimanded; and that Krupa often paged him over the intercom system, ordering him to return to his work area, though he seldom paged whites breaching the same work rule. Wilmington also had trouble getting Krupa to approve payment for the time he spent at work unable to weld because of broken equipment or other reasons. On another occasion, Krupa refused to get or unnecessarily delayed getting Wilmington protective leather clothing. Further, Wilmington testified that Carson moved Wilmington's welding booth to a position closer to the foremen's office and next to a grinder to keep a closer watch over him, to make his work station undesirable because of the danger of being injured by grinding splatter, and to allow a grinder, allegedly a close friend of Krupa, to spy on Wilmington for Krupa and Carson. Wilmington and his union representatives frequently

---

**5.** The jury verdict form propounded the following questions, and the jury inserted the following answers:

How many posts do you jurors find that the plaintiff welded on Monday, August 17, 1981?    <u>  100  </u>
<br>(insert number)

How many posts do you jurors find that the plaintiff welded on Wednesday, August 19, 1981?    <u>  100  </u>
<br>(insert number)

complained to Krupa, Carson, and even Lacke about this treatment, but without success.

In sum, Wilmington showed that his alleged conduct was similar to that of white employees and that the disciplinary measures Case enforced against him were more severe than those it enforced against white employees comparably situated. *See Moore v. City of Charlotte,* 754 F.2d 1100, 1105–06 (4th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). His evidence tended to show that Case did not discharge white employees (with disciplinary records similar to his) accused of falsifying time or labor cards for their first falsification, whereas Case did discharge him for his first alleged falsification. The special verdict shows the jury believed that Wilmington was the victim of intentional discrimination in the terms and conditions of his employment. Viewing the evidence in the light most favorable to Wilmington, we find there is substantial evidence to support the jury verdict and we hold that the District Court did not err in refusing to grant a j.n.o.v. or a new trial.

### III.

Case argues that the District Court erred as a matter of law in its treatment of the arbitral decision. At trial, the District Court admitted into evidence the outcome of the arbitration—the arbitrator's determination that Case had just cause to fire Wilmington. The court, however, did not admit the text of the arbitral decision or the arbitration transcript into evidence. The District Court refused to give the award preclusive effect, and was concerned particularly that the arbitral decision was based primarily on the arbitrator's assessment of the credibility of the witnesses, a function exclusively for the jury. The District Court also was concerned that the arbitration decision would unduly influence the jury, and concluded that its prejudicial effect outweighed its evidentiary value.

Case contends that the arbitral decision that Wilmington was not denied any contractual rights is entitled to preclusive effect. Because Case characterizes Wilmington's section 1981 action as arising solely out of his contractual rights,[6] Case argues that the preclusive effect of the decision vitiates Wilmington's cause of action and requires reversal of the judgment below. Case asserts alternatively that the arbitral award and transcript were admissible for purposes of assisting the jury in giving proper weight to the award.

Federal policy favors the arbitration of labor disputes, *Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 377, 94 S.Ct. 629, 636, 38 L.Ed.2d 583 (1974), particularly those involving contractual claims under collective bargaining agreements. Nevertheless, this policy does not apply necessarily to independent rights or claims derived from federal statutory schemes such as the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Fair Labor Standards Act, 29 U.S.C. §§ 201–219; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17; and the Civil Rights Act of 1866, 42 U.S.C. § 1981. The Supreme Court has considered the effect of arbitral decisions on claims brought under all but the last statute. *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (section 1983); *Barrentine v. Arkansas-Best Freight System,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (Fair Labor Standards Act); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (Title VII). In each case, the Supreme Court held that the arbitral decision did not preclude an independent cause of action under the applicable federal statute. A trial court may admit evidence of an arbitral decision, but the decision cannot preclude the exercise of rights independent of the collective bargaining process. 466 U.S. at 292 & n. 13, 104 S.Ct. at 1804 & n.

Designated Record (D.R.) at 266.

**6.** Section 1981 reads in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens ...."

13; 415 U.S. at 54, 59–60 & n.21; *see* 450 U.S. at 737, 744–45, 101 S.Ct. at 1443, 1446–47. This case, however, arises under section 1981, and the Supreme Court has not considered the effect of arbitral decisions on section 1981 actions. The question also is one of first impression for this Court.

### A.

In *Gardner-Denver,* the Supreme Court held "that the federal policy favoring arbitration does not establish that an arbitrator's resolution of a contractual claim is dispositive of a statutory claim under Title VII." 415 U.S. at 46 n. 6, 94 S.Ct. at 1018 n. 6. Like Wilmington, the plaintiff was a former employee who filed a claim of wrongful discharge under a collective bargaining agreement's grievance provisions. Before arbitration of that claim, he also filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), and raised this issue at the arbitration hearing. The arbitrator ruled that the plaintiff was discharged for cause, but did not mention the claim of racial discrimination. The EEOC did not find reasonable cause to believe discrimination had occurred, but the plaintiff nevertheless filed suit under Title VII. The district court granted summary judgment for the company, finding that the discrimination claim had been submitted to the arbitrator and resolved adversely to the plaintiff. The Tenth Circuit, in a *per curiam* opinion, affirmed on the basis of the district court's opinion. Reversing the Court of Appeals, the Supreme Court held that the grant of summary judgment was wrong as a matter of law.

The Supreme Court considered a number of factors in reaching its decision. It first concluded that the statutory scheme of Title VII does not suggest that an arbitral decision forecloses the right to sue under Title VII or otherwise "divests federal courts of jurisdiction." *Id.* at 47, 94 S.Ct. at 1019. The Court also found that congressional actions concerning employment discrimination evince a general intent to accord multiple remedies for discrimination. *Id.* It characterized federal policy against discrimination as of the "highest priority"—by implication overriding the federal policy favoring arbitration of labor disputes. *See id.* Thus, the Court rejected an election of remedies defense: a plaintiff does not have to choose between filing a grievance that results in arbitration and filing a lawsuit. *Id.* at 49–51, 94 S.Ct. at 1020–21. The Court also stated that an employee does not waive Title VII rights by being subject to a collective bargaining agreement. *Id.* at 51, 94 S.Ct. at 1021. Contractual and Title VII rights have "legally independent origins and are equally available to the aggrieved employee." *Id.* at 52, 94 S.Ct. at 1021. Moreover, arbitrators' authority comes from collective bargaining agreements, and they have no general authority to invoke public laws. *Id.* at 53–54, 94 S.Ct. at 1022. Furthermore, arbitral procedures are insufficient to resolve Title VII rights because they do not afford the same rights and protections as do judicial proceedings (*e.g.,* the rules of evidence do not apply in arbitration hearings). *Id.* at 56–58, 94 S.Ct. at 1023–24. Finally, the Court noted in passing that section 1981 affords employees protection similar to that of Title VII. *Id.* at 47 n. 7, 94 S.Ct. at 1019 n. 7.

The Supreme Court's next decision, *Barrentine,* reiterated many of these same factors. *See, e.g.,* 450 U.S. at 743–45, 101 S.Ct. at 1446–47. An employee brought an action alleging violations of the Fair Labor Standards Act's minimum wage provisions after first submitting the dispute to a union-management grievance committee. The Court emphasized that "[w]hile courts should defer to an arbitral decision where the employee's claim is based on rights arising out of the collective-bargaining agreement, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers." *Id.* at 737, 101 S.Ct. at 1443.

In its most recent decision concerning arbitral awards, the Supreme Court considered whether an unappealed arbitral award has preclusive effect in a section 1983 action in which the plaintiff asserted a violation of his first amendment rights. *McDonald*, 466 U.S. at 285, 104 S.Ct. at 1800. The Court commented on its prior decisions by stating:

> Our rejection of a rule of preclusion in *Barrentine* and our rejection of a rule of deferral in *Gardner-Denver* were based in large part on our conclusion that Congress intended the statutes at issue in those cases to be judicially enforceable and that arbitration could not provide an adequate substitute for judicial proceedings in adjudicating claims under those statutes. These considerations similarly require that we find the doctrines of res judicata and collateral estoppel inapplicable in this § 1983 action.

*Id.* at 289, 104 S.Ct. at 1803 (citations omitted). The Supreme Court found that section 1983 creates a cause of action which Congress intended to be judicially enforceable. The Court commented that an arbitration is not an adequate substitute for a judicial proceeding to protect federal statutory and constitutional rights, so "according preclusive effect to an arbitration award in a subsequent § 1983 action would undermine that statute's efficacy in protecting federal rights." *Id.* at 290, 104 S.Ct. at 1803.

■ Applying the reasoning of *Gardner-Denver*, *Barrentine*, and *McDonald* to the present section 1981 claim, we reach the same conclusions the Supreme Court has reached concerning Title VII, Fair Labor Standards Act, and section 1983 claims. We believe that the federal policy against racial discrimination embodied in section 1981 outweighs the policy favoring arbitration of labor disputes. Arbitral awards thus do not foreclose a plaintiff's exercise of section 1981 rights. Rights under a collective bargaining agreement and rights under section 1981 are independent and procedurally distinct. We conclude that Wilmington did not have to elect between filing a grievance to vindicate his contrac-

tual rights, or filing a lawsuit to vindicate his section 1981 rights.

Our holding finds support in the decisions of other courts considering this issue. In *Becton v. Detroit Terminal of Consolidated Freightways*, 687 F.2d 140 (6th Cir. 1982), *cert. denied*, 460 U.S. 1040, 103 S.Ct. 1432, 75 L.Ed.2d 791 (1983), the Sixth Circuit held "that a federal court may, in the course of trying a Title VII or section 1981 action, reconsider evidence rejected by an arbitrator in previous proceedings." *Id.* at 142. More recently, the Sixth Circuit also held that the Supreme Court's rationale in *McDonald* applies equally to suits brought under section 1981. *Rodgers v. Fisher Body Division*, 739 F.2d 1102, 1105 (6th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 1759, 84 L.Ed.2d 821 (1985). In *Strozier v. General Motors Corp.*, 635 F.2d 424 (5th Cir.1981), the Fifth Circuit held that *Gardner-Denver* applies to section 1981 as well as to Title VII suits. The court stated that contractual rights and remedies are distinct from Title VII and section 1981 rights and remedies, so an arbitral award adverse to the employee is not conclusive of rights under either statute. *Id.* at 425–26. *Accord McMiller v. Bird & Son*, 376 F.Supp. 1086 (W.D.La.1974). *See Evans v. Central of Georgia Railroad*, 619 F.Supp. 1364, 1366 (N.D.Ga.1985).

We agree with the other courts that have addressed this question. We see no principled basis for distinguishing cases involving section 1981 from similar cases involving Title VII, the Fair Labor Standards Act, or section 1983. Thus we hold that the District Court was correct in denying any preclusive effect to the arbitral award in this case.

### B.

Case argues that even if the arbitral award is not entitled to preclusive effect, nevertheless it was sufficient, as a matter of law, to satisfy Case's burden of articulating a proper reason for Wilmington's discharge. Therefore, Case submits, the District Court should have given Case's

proposed jury instruction 17A[7] to that effect. Case alternatively asserts that the District Court should have admitted into evidence the text of the arbitral award and the arbitration transcript to help the jury determine what weight to accord to the award.

■ In *Gardner-Denver,* the Supreme Court refused to adopt any particular standard concerning the weight to be accorded an arbitral decision. 415 U.S. at 60 & n. 21, 94 S.Ct. at 1025 & n. 21. *Gardner-Denver* was a Title VII case, which is tried to the court without a jury, and the Court left this matter to the trial court's discretion. In the present section 1981 case, the arbitrator's decision was simply another piece of evidence presented to the jury, and it was for the jury to decide what weight to give it. Thus we hold that the District Court was correct in declining to give the proposed instruction.

■ We also believe that the District Court did not err in refusing to admit the text of the arbitration decision and the arbitration transcript into evidence. The court was concerned that the arbitrator's comments and findings regarding the credibility of witnesses who also testified at trial would either usurp the jury's role in assessing credibility or would be unfairly prejudicial. The District Court's decision was dictated in part by the structure of the case: the just cause and race discrimination claims are interrelated and require similar elements of proof. Wilmington had to present at trial much of the same evidence presented at the arbitration. In similar factual circumstances, the Sixth Circuit noted that "[t]here is no realistic way to sever the discharge from the claim of discrimination because, according to the plaintiff, the discharge *is* the discrimination. An analysis of one must include consideration of the other because both involve the

same operative facts." *Becton,* 687 F.2d at 142 (emphasis in original). Considering all the relevant factors, we cannot say that the District Court abused its discretion in refusing to admit the text of the arbitration decision and the arbitration transcript into evidence.

The District Court did admit into evidence the fact that the parties had arbitrated Wilmington's claim of wrongful discharge and that the arbitrator had ruled in Case's favor. This gave Case some help in articulating and supporting a legitimate reason for Wilmington's discharge. As a practical matter, it could have helped convince the jury that Case's articulated reason for Wilmington's discharge was not pretextual. Although in the end the jury was not so convinced, we are satisfied that the District Court's ruling allowed Case all the mileage it was entitled from the arbitration decision.

### IV.

Case contends that the District Court erred in allowing Wilmington's statistical expert to testify. Case complains of unfair surprise because it learned only six days before trial that Wilmington would be calling an expert. In addition, Case contends, for many reasons, that the expert's testimony was irrelevant and should have been stricken. We disagree with these contentions.

The admission of expert testimony is a matter left to the discretion of the district court and we will not disturb that decision unless it is manifestly erroneous. *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *Holmes v. J. Ray McDermott & Co.,* 734 F.2d 1110, 1115 (5th Cir.1984). We find no abuse of discretion in the District Court's

---

7. The proposed instruction read:

The arbitration decision in favor of the Company in this case is sufficient to satisfy the Company's obligation of giving a legitimate, non-discriminatory reason for the plaintiff's discharge. Accordingly, the plaintiff has the burden of proving that the Company's reason

was a pretext for intentionally or purposefully discriminating against the plaintiff on account of his race.

D.R. at 244. In its instructions to the jury, the District Court properly and thoroughly explained the burdens of persuasion and proof. *E.g.,* D.R. at 252, 254–255.

decision admitting the testimony of Wilmington's expert witness.

■ The District Court did not enter a pretrial order setting a deadline for disclosing experts. Apparently this omission was an oversight. The expert's testimony was of some importance to Wilmington's case. Because of the short notice, however, the District Court allowed Case to depose Wilmington's expert, before he testified, in the presence of Case's expert. Wilmington provided Case with information concerning all the documents underlying his expert's analysis. The court also allowed Case's expert to be present in court when Wilmington's expert testified. Thus Case was not denied an opportunity for informed cross-examination and rebuttal of Wilmington's expert. Even if we apply the factors a district court should consider in deciding whether to exclude the testimony of a witness not made known in violation of a pretrial order—a more stringent test than necessary here—we still find no abuse of discretion. *See Patterson v. F.W. Woolworth Co.*, 786 F.2d 874, 879 (8th Cir.1986).

■ Case also contends that the District Court should have stricken the expert's testimony for irrelevancy. The statistical evidence that Wilmington's expert presented was a small part of a large body of evidence tending to show that Case discriminated against Wilmington on the basis of race. Basically all that Wilmington's expert was able to establish was that for 1980 and 1981 the disparity between the percentage of blacks employed at Case (3.5% to 4.5% of the work force) and the number of blacks discharged as a percentage of total discharges (43%) was statistically significant so that something besides chance alone explained the difference. The experts agreed that nothing further could be said about the data. Nevertheless, the statistical evidence had probative value, since "[g]ross statistical disparities between black and white discharge rates may be a telltale sign of purposeful discrimination." *Coates v. Johnson & Johnson*, 756 F.2d 524, 540 (7th Cir.1985).

There is, of course, "no bright line that divides evidence worthy of consideration by a jury, although subject to heavy counterattack, from evidence that is not.... 'When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out.'" *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 912 (2d Cir.) (quoting *Shepard v. United States*, 290 U.S. 96, 104, 54 S.Ct. 22, 25, 78 L.Ed. 196 (1933)) (citation omitted), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962); *see* Fed.R.Evid. 403. We do not believe that the testimony of Wilmington's expert gave rise to any significant risk of confusion. Although the number of discharges—twenty-seven—in the statistical base was not large, it was not so small as to require the District Court to strike the evidence, as in *Harper v. Trans World Airlines*, 525 F.2d 409, 412 (8th Cir.1975) (universe of five discharges, excluding plaintiff's).

Virtually all the inadequacies in the expert's testimony urged here by Case were brought out forcefully at trial either through cross-examination of Wilmington's expert or through the testimony of Case's expert. These matters go to the weight of the expert's testimony rather than to its admissibility. *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1139 (3d Cir.1983). The expert testimony may have helped the jury decide a difficult question of fact, namely, whether Wilmington's discharge was based on race. *See id.* at 1138–39 (referring to Fed.R.Evid. 702). There is nothing to suggest that it confused or misled them. Accordingly, the District Court did not abuse its discretion in refusing to strike the expert's testimony and we will not disturb the court's ruling. *Salem*, 370 U.S. at 35, 82 S.Ct. at 1122.

## V.

At trial, Case attempted to impeach Wilmington's testimony with statements he had made in a deposition. The District Court permitted his attorney, over Case's objection, to rehabilitate his testimony by eliciting from him the circumstances sur-

rounding the deposition. Case argues that this ruling constitutes reversible error. We find this argument to be without merit.

The scope of re-direct examination is within the sound discretion of the district court. *United States v. Foley*, 683 F.2d 273, 277 (8th Cir.), *cert. denied*, 459 U.S. 1043, 103 S.Ct. 463, 74 L.Ed.2d 613 (1982). So is the use of depositions at trial. *Cf. Campbell v. Barnett*, 351 F.2d 342, 344 (10th Cir.1965). Our review of the District Court's ruling centers on the application of Fed.R.Civ.P. 32(d)(3)(B), which precludes consideration at trial of errors or irregularities occurring during a deposition to which the parties did not object and which could have been obviated, removed, or cured if promptly presented.[8] Case asserts that Wilmington waived his right to complain about errors or irregularities by failing to object to them at the deposition. "The focus of the Rule is on the necessity of making the objection at a point in the proceedings where it will be of some value in curing the alleged error in the deposition." *Bahamas Agricultural Industries Ltd. v. Riley Stoker Corp.*, 526 F.2d 1174, 1181 (6th Cir.1975). In addition, "[t]he purpose of Rule 32 is to render technical objections based on errors and irregularities in depositions unavailable at the trial." 4A J. Moore, J. Lucas & D. Epstein, *Moore's Federal Practice* ¶ 32.11 (1984).

On re-direct examination, Wilmington's attorney elicited from him the conditions under which the deposition occurred: late in the evening, after an already long day, Wilmington was confused, the lawyers were upset and argued loudly, Wilmington had high blood pressure and had just been diagnosed a diabetic. Trial Transcript at 924–34. The testimony focused on his physical and mental condition at the time of the deposition, rather than on errors or irregularities that occurred during the deposition.

Wilmington did not object to Case's use of his deposition testimony to impeach his credibility. Rather he was attempting to place that testimony in context and to mitigate its effect, not to prevent its admission at trial. Case's reliance on Fed.R. Civ.P. 32(d)(3)(B) therefore is misplaced, since in our view the rule deals only with attempts to preclude the use of deposition testimony at trial, and does not apply to attempts to explain the circumstances surrounding the taking of the deposition. Case has not referred us to any cases involving the application of Rule 32(d)(3)(B) to bar testimony concerning the circumstances surrounding the taking of a deposition, and we could not find any. We conclude that the rule is no bar to the testimony at issue here. We also conclude that the District Court did not abuse its discretion by admitting this testimony.

## VI.

Case next claims as error the District Court's refusal to grant a new trial on the question of damages or to order a remittitur. Case contends that the jury's award of $400,000 in actual damages and $40,000 in punitive damages is grossly excessive, shocks the conscience, and generally is unsupported by the evidence. Case asserts that there was, for example, no evidence that Wilmington was impaired in his ability to earn money in the future. Nor was there any evidence, according to Case, of mental distress, degredation, or humiliation.

"An individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages." *Johnson v. Railway Express Agency*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). Our review of the District Court's ruling concerning actual damages is narrow:

---

**8.** Rule 32(d)(3)(B) reads:

Errors and irregularities occurring at the oral examination in the manner of taking the deposition, in the form of the questions or answers, in the oath or affirmation, or in the conduct of parties, and errors of any kind which might be obviated. removed, or cured if promptly presented, are waived unless seasonable objection thereto is made at the taking of the deposition.

[I]nadequacy or excessiveness of a verdict is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses and which knows the community and its standards; ... we shall continue to consider review ... only in those rare situations where we are pressed to conclude that there is "plain injustice" or a "monstrous" or "shocking" result.

*Solomon Dehydrating Co. v. Guyton,* 294 F.2d 439, 447–48 (8th Cir.), *cert. denied,* 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192 (1961); *Taken Alive v. Litzau,* 551 F.2d 196, 198 (8th Cir.1977); *Herrera v. Valentine,* 653 F.2d 1220, 1231 (8th Cir.1981). Each case must be reviewed within the framework of its distinctive facts. *Hollins v. Powell,* 773 F.2d 191, 197 (8th Cir.1985).

■ Without reiterating the case law in detail, we note that in *Williams v. Trans World Airlines,* 660 F.2d 1267, 1272–73 (8th Cir.1981),[9] this Court discussed the types and amount of evidence necessary to justify an award of actual damages for injuries that included humiliation and emotional suffering. A careful review of the record convinces us that the jury's award to Wilmington of actual damages was not plain injustice, or a monstrous or shocking result. Wilmington presented evidence of his earnings, fringe benefits, and other data related to a determination of lost pay. He also presented evidence of his inability to secure another job after Case discharged him. In addition, his testimony as well as that of other witnesses tended to show a deterioration in his health, mental anxiety, humiliation, and emotional distress resulting from the conditions under which he worked at Case and from his discharge. We cannot say that this evidence is inadequate to support the jury's award of compensatory damages.

■ Regarding Wilmington's punitive damages, in *Block v. R.H. Macy & Co.,* 712 F.2d 1241, 1245–48 (8th Cir.1983), we held that punitive damage awards are permissible in section 1981 actions and that the amount of the award lies within the jury's discretion. The punitive damage award must bear a reasonable relationship to the actual damages, *Hollins,* 773 F.2d at 198, but we will disturb it only when it appears unfair and shocking. *Block,* 712 F.2d at 1248. Here, an award of $40,000, in light of Wilmington's evidence and an actual damage award of ten times that amount, does not strike us as unfair or shocking.[10]

## VII.

Case's final assertions of error focus on the District Court's award of attorneys' fees in the amount of $35,721.25 and costs of $5,575.08. First, Case claims that Wilmington is not entitled to attorneys' fees under 42 U.S.C. § 1988 because he failed to prove his case.[11] In light of our prior holdings in this opinion, we reject this argument without further discussion. Second, Case argues alternatively that the District Court should not have awarded attorneys' fees because the award will result in a windfall to Wilmington's attorneys who have a contingent fee contract with Wilmington. Case likewise contends that the issues were neither complicated nor novel and thus attorneys' fees are not warranted. Third, Case argues that the District Court

9. *Williams* initially applied to both Title VII and section 1981 actions; however, we have since limited the discussion concerning compensatory damages to section 1981 actions. *Muldrew v. Anheuser-Busch, Inc.,* 728 F.2d 989, 992 & n. 2 (8th Cir.1984).

10. We note the existence of a growing body of academic work suggesting that punitive damages may be unconstitutional. *See* Jeffries, *A Comment on the Constitutionality of Punitive*

*Damages,* 72 Va.L.Rev. 139 (1986). In the present case, however, the constitutional issue has not been raised, and thus we do not consider this interesting and significant question.

11. Section 1988 provides in part: "In any action or proceeding to enforce ... section[ ] 1981 ... the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs."

erred in awarding Wilmington costs for his expert witness under 28 U.S.C. § 1920.[12]

The award of attorneys' fees is a matter uniquely for the district court's discretion and we will not overturn that decision absent an abuse of discretion or an error in implementing the governing legal standards. *Moore v. City of Des Moines*, 766 F.2d 343, 346 (8th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 805, 88 L.Ed.2d 781 (1986). Having reviewed the District Court's award of attorneys' fees in light of our knowledge of the case, we find no abuse of discretion or error of law. The District Court properly considered all the appropriate factors that influence the determination of a fee award, and we conclude that the amount awarded is not excessive. *See Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir. 1974). We are concerned, however, that Wilmington's attorneys may benefit from a windfall if they receive both the fee award of $35,721.25 and the full amount due under the contingent fee agreement.[13] The agreement is silent on the question of whether the contingent fee is to be reduced by the amount of any fees awarded by the court.

Courts have long exercised broad powers over various aspects of the attorney-client relationship. These powers include supervising contingent fee arrangements. *Cooper v. Singer*, 719 F.2d 1496, 1504–05 (10th Cir.1983) *(en banc)*. Courts have a duty under section 1988 to assure that the award of fees is reasonable, and the concept of reasonableness precludes an award that serves merely as a windfall to already amply compensated attorneys. *Blum v. Stenson*, 465 U.S. 886, 893–94, 104 S.Ct. 1541, 1546–47, 79 L.Ed.2d 891 (1984) (quoting S.Rep. No. 1011, 94th Cong., 2d Sess. 6, 1976 U.S.Code Cong. & Ad. News 5908, 5913). The Senate Report explained that an award under section 1988 should be adequate to attract competent counsel for civil rights cases, but should not result in windfalls to counsel. 1976 U.S. Code Cong. & Ad. News, *supra*, at 5913.

Unlike several circuits, we do not believe that the award of fees under section 1988 should circumscribe the amount attorneys may recover by limiting compensation to the statutory award regardless of other arrangements with the client. *Cooper*, 719 F.2d at 1506–07; *Wheatley v. Ford*, 679 F.2d 1037, 1041 (2d Cir.1982). To our minds, to limit attorney compensation in that manner would be an unwarranted interference with a private contract. As the Eleventh Circuit has observed, a contingent fee contract represents the client's and the attorney's notions of a reasonable fee. *Pharr v. Housing Authority*, 704 F.2d 1216, 1218 (11th Cir.1983). Along similar lines, the Seventh Circuit recently held that a contingent fee agreement is an appropriate measure of attorneys' fees for those types of cases in which it represents the "market rate for the services reasonably required to produce the victory." *Kirchoff v. Flynn*, 786 F.2d 320, 328 (7th Cir. 1986). We also are inclined to agree with the Ninth Circuit, which has held that normally the plaintiff should be responsible for the difference between the statutory award and the contingent fee amount. *Hamner v. Rios*, 769 F.2d 1404, 1409 (9th Cir.1985). Accordingly, we affirm the District Court's award of fees, but to avoid a windfall for Wilmington's counsel, we order that the statutory award be modified to provide that it shall be applied toward the amount due Wilmington's attorneys under the contingent fee agreement, not in addition to the amount due under that agreement. Besides avoiding the windfall problem, this approach also has the virtue of

---

**12.** Section 1920 provides in part: "A judge or clerk of any court of the United States may tax as costs the following: ... (3) Fees and disbursements for printing and witnesses...."

**13.** The contingent fee agreement provides that the attorneys shall receive one-third of Wilmington's total recovery. Thus, the amount due under the agreement, not considering costs, is approximately $146,667.

enhancing the value to Wilmington of the damages that the jury has awarded him.

■■■ Finally, we address the costs taxed against Case for Wilmington's expert witness. In awarding costs under 28 U.S.C. § 1920, the District Court stated that Wilmington's expert "presented evidence that was very valuable to plaintiff's case—no doubt crucial to the issues decided by the jury." *Wilmington v. J.I. Case Co.,* No. 82–182–D–2, slip op. at 4 (S.D. Iowa July 19, 1985) (order allowing attorneys' fees and costs). We have held that expert witness fees are recoverable under Fed.R. Civ.P. 54(d) [14] when the expert's testimony was crucial to the resolution of issues in the case. *Nemmers v. City of Dubuque,* 764 F.2d 502, 506 (8th Cir.1985). That approach is equally applicable to expert witness fees under section 1920. The necessity or usefulness of an expert witness is a matter peculiarly for the District Court in light of its familiarity with the case, *Coleman v. City of Omaha,* 714 F.2d 804, 809 (8th Cir.1983), and appellate review of a trial court's decision in that regard is governed by the abuse of discretion standard. *Hiegel v. Hill,* 771 F.2d 358, 360 (8th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). We are satisfied that the District Court did not abuse its discretion in awarding Wilmington costs for his expert's testimony.

## VIII.

We have considered all of Case's other arguments and find them meritless. Accordingly, we affirm the judgment of the District Court in its entirety, although for the reasons previously mentioned we modify the attorneys' fee award to provide that the amount Case pays pursuant to that award shall be applied against the amount due Wilmington's attorneys under their contingent fee agreement with Wilmington, and shall not be in addition to the latter amount.

<hr />

14. Rule 54(d) states in relevant part: "Except when express provision therefore is made either in a statute of the United States or in these

rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs...."