**Carl MORSE, Plaintiff,**

v.

**SOUTHERN UNION COMPANY, Defendant.**

**No. 96–0719–CV–W–6.**

United States District Court,
W.D. Missouri,
Western Division.

March 3, 1998.

Michael S. Ketchmark, Brett A. Davis, Ketchmark & Eischens, Kansas City, MO, for plaintiff.

John R. Phillips, Toni Hays Blackwood, Brian J. McGrath, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, MO, Curtis E. Woods, Tamara Seyler–James, Sonnenschein Nath & Rosenthel, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

SACHS, District Judge.

Pending before the court are motions for judgment as a matter of law, new trial, or remittitur.[1]

Carl Morse has enjoyed extraordinary success in his age discrimination suit against his former employer, Missouri Gas Energy or MGE, a division of Southern Union Company. After an unblemished thirty-year career with MGE and its gas company predecessors, he was summarily removed as Supervisor of the Plant Accounting Department and simultaneously discharged from the company in January 1996. The meeting where he was informed of his termination consisted of a brief discussion of paperwork which left him in a state of shock. There was no meaningful explanation of his removal from his job assignment, and no reason was given for the firing.

Displacement from the plant accounting unit has been explained at trial as the result of computer-assisted efficiencies. That ultimately allowed one accountant and a Southern Union supervisor, giving limited time to the work, to accomplish the tasks previously performed by three or four persons. Plaintiff, the eldest, in his early fifties, was the first to be let go.[2] The remaining part-time supervisor and the accountant who absorbed his duties are somewhat younger than he—probably enough younger, and with a younger appearance, to be considered materially younger for discrimination analysis.

Morse had a varied career with the gas company, including service in the engineering department at Lee's Summit, Missouri, before he was recruited in early 1994 to return to plant accounting (dealing with records of company properties) at divisional headquarters on Broadway in Kansas City. After a commendable record noted by his supervisor, Stuart Harbour, Controller for MGE, in November of that year, his performance during the second year was less admirable, according to Harbour's ratings made in November 1995. Harbour's stated reservations about Morse's work related to-alleged deficiencies in adjusting to a new computer system installed in July 1995. Harbour now disclaims any disciplinary intent, however, and contends simply that Morse's work was taken over by a computer. Moreover, even after the hostilities engendered by litigation, Harbour generalizes that Morse was nearly an average quality employee, perhaps "slightly" below average.[3]

The termination aspect of the decision lacks a reasonable, legitimate explanation.[4] At trial there was some suggestion by Harbour and Ms. McDonald, the former head of the Human Resources Department, that the thought of transferring Morse within the company flickered through their minds, and allegedly was halfheartedly pursued by Harbour before the date of termination. I assume this evidence was rejected by the jury, except as confirmation that it would be ordinary business practice to review alternatives for retaining a long-term employee with an adequate record, rather than discarding him like an obsolete computer system. The Harbour testimony about a job search was disputed by Jerry Fast, then a supervisor at Lee's Summit. There were also serious inconsistencies between the Har-

---

1. Separately pending is a front-pay issue, which will be granted up to age 62, and a fee issue, still being briefed.

2. It is not clear whether clerical employees who left the work were terminated or relocated within the company.

3. The jury may have been favorably impressed by Morse's crisp, intelligent testimony. While I was troubled by a credibility issue regarding alleged progress in preparing a manual for the new computer system, that was not a material issue in the case as no such progress was reported to Harbour.

4. Arbitrary action by employers is within their prerogatives, but invites a close look for likely prohibited motivation. Senseless inhumanity in personnel decisions is not to be ordinarily expected. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 580, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

bour testimony and that of Ms. McDonald. In any event, nothing was said to Morse about exploring the possibility of retaining him in the company, such as asserting that there was unfortunately no place for him to go. He has no memory that he was told that job performance was *not* an issue, and he reacted accordingly—as though he had been fired for some undisclosed deficiency. There is no claim that the termination was announced in a sympathetic manner. There was no hand shake or back-patting. Some fifteen months earlier Morse had been partied and feted by Harbour, in honor of his three decades with the company. Something must have changed.

Apart from some recorded reservations about Morse's abilities to master the new computer work and another supervisor's undisclosed impatience about his failure to prepare the manual, the major event that would most likely explain the termination was an occasion in April 1995, where old-timers and other managerial employees at MGE were introduced to the thinking of Southern Union's top management, including the Chief Operating Officer, Peter Kelley. According to plaintiff's middle-aged and aging witnesses, who were probably believed by the jury, it was a traumatic event for them. Dramatic changes were said to be on the way. "Young blood" was needed. MGE would have a "fresh new look." Employees should expect to work for a number of companies during a career. MGE was not a place were people should expect to retire. Discipline should

be tightened. Managers were asked to recall when they had last fired someone. Even defendant's reply brief, at page 19, concedes the jury could conclude that the defendant's top management "*expressed a preference for a younger work force.*"

The older managerial employees in particular felt threatened as to their job security. Nine months later Morse was gone.[5]

There is no proof that Kelley or other top managers at Southern Union were directly involved in the Morse termination (although Kelley claimed it was his practice to review all performance reviews of managerial employees, including Morse). Harbour was present at the meeting, and the jury was entitled to conclude, as I noted before trial, that it could reasonably be inferred that he took his "marching orders" from the discussion at the round table session, if such a message was verified at trial. Harbour's superior at Southern Union, Donald Kvapil, was also present, which may have been significant, although he has not been proved to have been a motivator of the termination.[6]

■ The jury was entitled to conclude that a harshly handled termination of a longtime management employee, without making a good faith effort to relocate a person whose general ability is unquestioned and who apparently had transferable skills, is so remarkable that, with other evidence of age consciousness and desire for a "new look," it probably was because of his age.[7] agree with the jury in its finding for Morse on the termination.

5. The sense of underlying hostility at the meeting toward older long-time employees was somewhat bolstered in briefing by defendant's characterization of the old gas company as an inefficiently operated organization. The scene was laid, therefore, for a shakeup, targeting older employees.

6. There are reasons to suppose that Harbour was influenced or directed by Kvapil. In the November 1995 review, Harbour's records suggest an intention that Morse remain in place for some months, if not indefinitely. Kvapil wrote on the form that "immediate" action should be taken by Morse to produce an operating manual for the new computer system. Harbour talked to Kvapil about

Morse and, instead of directing Morse to hurry up with his work on the manual, he decided to terminate Morse and did so summarily. It may be inferred that both Kvapil and Harbour remembered Kelley's expressed wish to rejuvenate the work force. In my view it is preposterous to use a "stray remarks" defense in this case.

7. *Compare, Throgmorton v. U.S. Forgecraft Corp.*, 965 F.2d 643, 645 (8th Cir.1992). Other possible explanations such as downsizing or reduced cash flow are contrary to the evidence. Ms. McDonald's trial testimony of an impression there were no openings over a long period of time is contrary to specific evidence of job availabilities. Although not

Without belaboring the evidence, I am more skeptical of that part of the special verdict that finds age discrimination in the shrinking of the plant accounting unit, and choosing Morse as the one to leave. It is, however, in my evaluation, a jury question, particularly when supported by plaintiff's version of the roundtable discussions.[8]

## I.

Defendant contends that plaintiff failed to make a submissible case. On the contrary, I believe this was an exceptionally strong case, although packaging and boxing it in legal terms may be more difficult. As suggested in my pretrial orders, I have engaged in some semantic waffling. It may not be a "smoking gun" direct evidence case, but it is a good deal stronger than a purely circumstantial case, where there is no direct evidence of corporate intent to rejuvenate the workplace. Such evidence is rarely available.

On balance I suppose it qualifies as a direct evidence case.

The most vulnerable aspect may be whether an available job at Lee's Summit could be found, but this was not necessary to establish liability in light of the verdict as to the accounting unit itself. If the jury did not have enough evidence to support that part of the verdict, however, the Fast testimony was alone probably sufficient. An opening was testified to, based on the resignation of a particular supervisor. The "maybe" qualifier now cited by defendant (Tr. 471) could mean various things, including whether plaintiff wanted that particular job. In context the jury could conclude that a job was probably available for an employee as versatile as plaintiff. Defendant did not cross-examine on the point and did not bring in its own contrary evidence, as it seems to do in a post-trial affidavit which limits itself to supervisory positions.[9]

Defendant asks the court to "confine" *Throgmorton, supra,* "to its facts." This is more properly addressed to the Court of Appeals. Giving the message from Southern Union managers its full flavor, I doubt that the "pervasive" hostility in *Throgmorton* makes that case exceptional. When the boss tells lesser executives that he wants a "younger work force" it may be assumed they will listen.[10] I am also satisfied that an employee who has been harshly terminated has no legal duty to "apply"

presented to the jury, there was also statistical evidence of significant turnover, presumably resulting in job openings.

Of course, as the jury was instructed, there is no legal duty to look for a safety net before discharging a thirty-year employee. Large layoffs, or layoff of unsatisfactory or short term employees, may not be commonly accompanied by an attempt to place employees elsewhere in the company. But an attitude of cold disinterest in someone with Morse's record of service is most consistent with the purpose of achieving a "fresh new look."—or at least the jury, exercising common sense and their experiences in life, could so find.

8. The testimony of plaintiff's witnesses regarding the roundtable session rings true, despite some probable misattribution to Mr. Kelley and the like. I found the denials unconvincing. The most interesting testimony was from Ms. McDonald, who was theoretically an "independent" witness. Even if in her current work she has no financial expectations from Southern Union, her professional competence would be in issue if the roundtable discussion triggers a multi-million dollar personnel problem. Doubts will be enhanced regarding such matters as her sophistication about age discrimination linguistics, her authority within the company and her courage. If she heard unfortunate remarks why did she not stop the proceeding to publicly lecture or pass a strong note to the "top brass"? She testified she would have done so, but this may be doubted.

9. It cannot be assumed, as defendant seems to, that plaintiff would reject a less desirable position, with less pay, at least temporarily. The evidence is that he was willing to travel several hours daily to obtain somewhat comparable work. The relocation pay grade might affect damages, but not liability.

10. Neither side introduced statistical evidence, but I do not believe that helps defendant. Reducing the work force age level would not occur overnight, or even after nine months, unless it could be inferred that Kelley advocated using a firing squad.

for a transfer. In any event, the jury rejected the failure to mitigate hypothesis presented in Instruction No. L.

## II.

Defendant contends that the jury was misdirected in the special verdict form, in the definition of determining cause. Defendant contends that I should have used an edited version of Eighth Circuit model instruction 5.92, as submitted by it and refused.

There are several responses. The unedited version of instruction 5.92 has the very language that defendant objects to, as an alternative that judges may use in their discretion, noting that the language to which defendant objects may be rejected as a "comment on the evidence." Note on Use, number 5. It is not substantively questioned by the committee, even in the 1998 version.

■ The problem referred to was not raised on the record at the instruction conference, and is thus not a sound basis for appeal. *Dupre v. Fru–Con Engineering, Inc.*, 112 F.3d 329 (8th Cir.1997). Although portions of the applicable part of the instruction conference (Doc.127) were off the record, I am satisfied the point was not made at that time. Off the record portions of the discussion are generally used by me for paper-shuffling and judicial brain-storming, not to suppress argument. The point now made may well have been in counsel's head, but I am satisfied it was not expressed.

In any event the ultimate question directed to the jury was clear, as was the underlying instruction. If the language used by the committee in the discretionary part of the definition may have been inept or contrary to other parts of the submission I am satisfied there was no harmful misunderstanding—and, of course, there were no questions from the jury about claimed inconsistency.

## III.

There is little doubt that plaintiff proved a willful violation of the ADEA. Defendant's argument that Chief Judge Arnold's opinion in *Maschka v. Genuine Parts Co.*, 122 F.3d 566 (8th Cir.1997), applies "an erroneous standard" is best addressed to the Court en Banc.

## IV.

The punitive damage award was appropriately imposed under Missouri law, but I agree it was quite excessive and is subject to remittitur (unless plaintiff elects to retry the case).

■ It is hard to imagine a much more flagrant violation of age protection laws than for the highest executives of the company, in a get-acquainted session with local management, to express "a preference for a younger work force"—particularly in a conference challenging managers to exercise their firing powers, and declaring that modern company practices will result in multiple employments before retirement. The jury was entitled to conclude that Messrs Harbour and (likely) Kvapil hardened their hearts, forgot about commonly-accepted personnel practices in their company and elsewhere, and took an early opportunity to discharge plaintiff, despite his proven ability to perform adequate service. Harbour's apparent discomfort with the procedure seems obvious from his termination session with Morse, worthy of a session with an embezzler.[11]

Under the evidence, as found by the jury, I do not see how the jury could fail to be outraged and to find that defendant was at least recklessly indifferent to the rights of its employee. That is what is required under Missouri law. *Nelson v. Boatmen's Bancshares, Inc.*, 26 F.3d 796, 803 (8th Cir.1994).

---

11. Contrary to plaintiff's theory, which may have been accepted by the jury, my supposition is that Harbour was unusually age sensitive but not personally unfair to plaintiff because of plaintiff's age. I believe he was driven or strongly influenced by the round table session and the desire to carry out company policy.

■ Defendant argues that the court failed to use the "clear and convincing" standard of proof for punitive damages, as required by a Missouri Supreme Court decision handed down some months before trial. *Rodriguez v. Suzuki Motor Corp.,* 936 S.W.2d 104, 111 (Mo. banc 1996) The parties did not object to that aspect of the submission, however, and waived the issue. *Letz v. Turbomeca Engine Corp.,* 1997 WL 727544, (Mo.App. W.D., Nov.25, 1997), n. 5; *Fed. Crop Ins. Corp. v. Hester,* 765 F.2d 723, 727 (8th Cir.1985). In any event, I am positive that any instructional error was harmless, given the amount of the award and the evidence of outrageous conduct.

■ The amount of the award cannot, however, be approved, given the pattern of punitive damage awards in comparable cases approved by the Circuit. Considering back pay, front pay and the appropriate emotional distress award, as well as the caps placed by Congress in discrimination cases (including double-recovery in age cases) and punitive damage awards approved by the Missouri courts, I believe $400,000 is the maximum that should be allowed the plaintiff.[12] Such an award is driven largely by what defendant calls "the 'phantom' plan to eliminate older workers," more euphemistically described by it elsewhere as Mr. Kelley's "expressed ... preference for a younger work force." As stated earlier, this introductory statement of the policies of new management was surely a plan of action, affecting the entire staff at MGE.

My conclusion, as well as the jury's, is based upon the firing of plaintiff, not his mere displacement from the accounting department. The displacement alone (with a soft landing elsewhere in the company) would probably not merit an award of $100,000.

It is unnecessary to decide whether $6.25 million would violate Due Process, but my selection of $400,000 (or even $1 million) seems entirely safe.

## V.

■ The emotional distress award of $450,000 seems so far out of line from termination awards generally that I conclude it must be reduced to $70,000, as a more appropriate figure, unless plaintiff elects a new trial.

Plaintiff's recovery for emotional trauma is in a sum far in excess of the allowable recovery in cases involving wrongful terminations, even in humiliating circumstances. In what may be considered a typical case, an opinion by Chief Judge Posner opined that $21,000 was too much. "Judges and juries must not be casual with other people's money." *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1229 (7th Cir.1995). A remittitur of $10,500 was allowed, "to keep the award ... within the limits of the rational." [13]

On the other hand, significantly larger awards in comparable contexts have been approved. *EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276 (7th Cir.1995) ($50,000, where unusual mental suffering was shown); *McIntosh v. Irving Trust Co.,* 887 F.Supp. 662, 666–8 (S.D.N.Y.1995) (noting that most awards have been in the $5,000–$10,000 range but citing New York proceedings where awards have ranged as high as $300,000); *Hughes v. Regents of University of Colorado,* 967 F.Supp. 431,

---

**12.** Apparently other discharged employees will rely on some of the same evidence. The allowable punitive damages, if only plaintiff were a claimant, would in my judgment total $1 million. While the Missouri courts seem not to have considered whether the likelihood of multiple claims should limit punitive damage recoveries, I believe such a factor may be required by Due Process, and is quite likely to be used in remittitur proceedings under § 510.263.6 RSMo. *See Dunn v. HOVIC,* 1

F.3d 1371, 1391 (3d Cir.1993) (citing Restatement of Torts); *Stafford v. Puro,* 63 F.3d 1436, 1444 (7th Cir.1995) (citing Illinois law). I would confine § 510.236.4 RSMO, which is not applicable in any event because there is no prior related case, to cases based on *identical* facts—typically mass-tort cases.

**13.** Circuit Judge Bright of the Eighth Circuit was on the *Avitia* panel.

437–9 (D.Colo.1996) ($50,000 awarded on remittitur, noting comparable awards where emotional damage was severe).

The present case justifies an award that is considerably out of the ordinary, in light of plaintiff's long service to defendant and its predecessors, with much greater shock likely than where a short-term employee has been wrongfully discharged; the Kafkaesque manner of termination; and the expert proof and family proof of plaintiff's reactive depression. An award of $70,000, about five times that which would ordinarily be justified, seems the maximum authorized here.

## VI.

■ Defendant claims prejudicial surprise and insufficiency of proof on the theory of recovery based on termination (failure to transfer) as an element separate from and more aggravating than the mere displacement of plaintiff from his position as accounting supervisor.

I acknowledge that both sides in the litigation appear to have prepared themselves far more thoroughly on the minor aspect of the case (the job displacement) than on the major aspect (the termination). Pre-trial briefing in particular seemed to concentrate on that point. However, both sides were well prepared on why plaintiff, rather than others in the small accounting group, was selected for displacement. This was an aspect of the termination question, since a reorganization of the accounting group that retained plaintiff would have avoided termination.

There was also deposition preparation on whether plaintiff could have been placed in Lee's Summit, transferring back to his line of work before 1994. This was referred to by plaintiff in opening statement. Tr. 128 (Doc. 143). It was dealt with in testimony without objection. Tr. 470 (Doc. 144). Plaintiff also offered testimony, without objection, that plaintiff was trained to "do every task out there (in Lee's Summit) in operating services or any supervisory jobs." Tr. 465 (Doc. 144).

Defendant was well aware of the transfer problem it was facing, and suggested a voir dire question dealing with that subject. Tr. 78 (Doc. 143).

Defendant's proposed instructions presented the issue of wrongful *termination* as such (Instructions No. 17 and 25) and did not limit themselves to the removal of plaintiff from his accounting position. As I suggested to counsel early on, perhaps off the record, even if the attorneys neglected to develop fully or argue the possibility of transfer within the company, a juror in deliberations could always perceptively note that displacement might be justified, but that would not answer the termination question, which was the bottom-line issue. That is why I used an instruction that made clear that plaintiff, an employee at will, could legally be terminated rather than transferred if there were no reason to keep him in his particular job assignment, but that an age-based decision to fire rather than transfer him would violate the law.

The claim of unfair surprise is therefore unwarranted. Moreover, defendant did not ask for even a day's continuance to prepare itself more thoroughly on the transfer issue. In a post-trial affidavit, defendant apparently takes issue with testimony that a supervisor's position was available at Lee's Summit, by reason of the resignation of a "young supervisor," but that would not establish that no suitable positions were available there. Defendant also does not explain why there was no rebuttal to the Fast testimony about a supervisory vacancy. Presumably fresh memory about such a personnel issue could have been pulled together in a matter of hours, and computerized records could also have been quickly scanned.

## CONCLUSION

For reasons discussed, and after considering all of defendant's contentions, I deny its motions for judgment as a matter of law or for new trial, but will grant remittitur of the punitive damage award to $400,-

000 and of the emotional distress award to $70,000, unless, within 20 days of this date, plaintiff files notice of his election to retry the case.[14]  SO ORDERED.

14.  Presumably plaintiff can cross-appeal my remittitur ruling even if he chooses not to seek a new trial, but my suggestion on this appellate question is not researched or binding on appeal.