# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2050

_____

Carl Morse,                                    *
                                               *
            Appellee,                          *
                                               *    Appeal from the United States
      v.                                       *    District Court for the
                                               *    Western District of Missouri.
Southern Union Company, a Delaware             *
Corporation,                                   *
                                               *
            Appellant.                         *

_____

Submitted: February 11, 1999
Filed: April 14, 1999

_____

Before BOWMAN, Chief Judge, FAGG, and HANSEN, Circuit Judges.

_____

BOWMAN, Chief Judge.

      Southern Union Company appeals from the judgment of the District Court[1] entered on a jury verdict returned in favor of Carl Morse on his age discrimination claims.  We affirm.

_____

      [1]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

# I.

"'We recite the facts in the light most favorable to the jury verdict and the district court's findings.'" <u>Denesha v. Farmers Ins. Exch.</u>, 161 F.3d 491, 496 (8th Cir. 1998) (quoting <u>Newhouse v. McCormick & Co.</u>, 110 F.3d 635, 637 (8th Cir. 1997)). In 1964, Morse began working for Gas Service Company, which underwent several ownership changes before being acquired by Southern Union in February 1994. Southern Union formed a division called Missouri Gas Energy (MGE) to operate the acquired company. Morse held a variety of positions during his thirty-two years with the company and had a positive work history. He joined the plant accounting department in 1967, becoming a supervisor in 1976 and a manager in 1980. In 1985, when the accounting department was moved to Topeka, Kansas, Morse chose to take a non-management position in the engineering department in Lee's Summit, Missouri, instead of moving to Topeka. In March 1994, Stuart Harbour, MGE's Controller, recruited Morse to join MGE's newly-created plant accounting department as its supervisor.

In April 1995, Southern Union's top management, including President Peter Kelley, held a series of "roundtable" meetings with all MGE supervisory-level employees. During these meetings, according to the testimony of Morse and several former MGE employees, Kelley expressed a preference for younger employees and indicated that dramatic changes were on the way for MGE. He wanted young blood and a young, fresh, new look. Kelley stated MGE was not a place people should expect to retire from and people should not work anywhere for more than ten years. Kelly also wanted younger supervisors because they accepted change better and had more ambition. The supervisory-level employees in attendance were asked to recall when they had last fired someone and were reminded that they possessed the authority to fire employees within their supervision.

Morse's supervisor, Stuart Harbour, attended one of these roundtable meetings, and Harbour terminated Morse's employment approximately nine months after the meeting. Morse presented evidence that Harbour had made various remarks to him about his age, including repeated references to him as the "old man" in accounting. At a celebration honoring Morse's thirty years of service, Harbour stated that it was rare for people to work for one company as long as Morse had and noted that he was only five or six years old when Morse began working for the company. Harbour also had given Morse a drawing of a wrinkled older man with no hair or teeth that was labeled "Typical Plant Accountant," which Harbour had brought back from Southern Union's headquarters because it had reminded him of Morse.

On January 22, 1996, Harbour terminated Morse's employment without providing a reason for the termination. Morse was fifty-two years old. Morse had received a good performance review from Harbour in November 1994, and he was awarded a four percent merit-based salary increase in May 1995. A less favorable review in November 1995 was, according to Harbour's testimony, the result of Morse's alleged deficiencies in learning the operations of a new computer system and his failure to draft an operating manual for the new system. The review, however, set numerous goals for Morse in the upcoming year that would "greatly benefit MGE and further develop [Morse's] abilities." Appellee's App. at 359. Only a few weeks after this review, Harbour made the decision to fire Morse.

At trial, Southern Union argued Morse's position was eliminated on account of efficiencies created by a new computer system which became operational on June 30, 1995. According to Southern Union, this new computer system allowed one accountant to accomplish the tasks previously performed by four employees and eliminated the functions of Morse's position with the exception of a thirty-minute manual calculation per month. Harbour testified that Morse was displaced from his position because of the computer-created efficiencies, and not for performance reasons. Harbour and the personnel director testified that no positions were available

within the company to which Morse could have transferred when his position was eliminated and, consequently, that Morse's employment with Southern Union was terminated.

Morse sued Southern Union for age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621-634 (1994), and the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. § 213.010-.137 (1994). The jury returned a verdict for Morse, finding that Morse's age was a motivating and determining factor in Southern Union's employment actions regarding Morse and that Southern Union's violation of the ADEA was willful. The jury awarded Morse $450,000 in compensatory damages for emotional distress, $6,250,000 in punitive damages, and $29,073 in back pay. The District Court, on post-trial motions, reduced the compensatory and punitive damages awards and entered final judgment awarding Morse $70,000 in compensatory damages, $400,000 in punitive damages, $29,073 in back pay, $86,456 in front pay, and attorney fees and expenses.

Southern Union appeals the District Court's denial of its motion for judgment as a matter of law on the issues of liability, punitive damages, and willful violation of the ADEA and the denial of its motion for a new trial on the basis of alleged instructional errors. Southern Union also asserts that the remitted compensatory and punitive damages awards are grossly excessive and that the District Court abused its discretion in awarding front pay. For the reasons stated below, we affirm the judgment of the District Court.

II.

In reviewing de novo the denial of a motion for judgment as a matter of law (JAML), we must determine whether sufficient evidence supports the jury verdict. See Denesha, 161 F.3d at 497. Our review of a jury verdict is extremely deferential and we will not reverse for insufficient evidence unless "'after viewing the evidence

-4-

in the light most favorable to the verdict, we conclude that no reasonable juror could have returned a verdict for the non-moving party.'" Id. (quoting Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir. 1997), cert. denied, 117 S. Ct. 2510 (1997)). We must consider the evidence in the light most favorable to Morse, assume all conflicts in the evidence were resolved in Morse's favor, assume Morse proved all facts that his evidence tended to prove, and give Morse the benefit of all favorable inferences that reasonably may be drawn from the proven facts. See id. To prevail on its motion for JAML, Southern Union has the difficult task of demonstrating that all the evidence points in Southern Union's direction and is susceptible of no reasonable interpretation sustaining Morse's position. See id. We apply the same analysis to Morse's ADEA and MHRA claims. See Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1156 (8th Cir. 1999).

## A.

Southern Union argues insufficient evidence exists to support the jury's verdict that it intentionally discriminated against Morse because of his age. Contending that no evidence causally links Kelley's remarks to the termination of Morse because Harbour was the sole decision-maker and did not consider Kelley's remarks in his decision, Southern Union characterizes Kelley's remarks as either stray remarks or statements by a non-decisionmaker and, thus, as insufficient evidence of intentional discrimination.[2] We disagree.

"When a major company executive speaks, 'everybody listens' in the corporate hierarchy, and when an executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it can not compartmentalize this executive

[2]Southern Union also asserts Harbour's age comments were stray remarks or remarks unrelated to the employment decisions. Although these comments alone may not be sufficient evidence to support the jury's verdict, the jury reasonably could have considered the comments along with the other evidence of age animus in reaching its verdict.

as if he had nothing more to do with company policy than the janitor or watchman." Lockhart v. Westinghouse Credit Corp., 879 F.2d 43, 54 (3d Cir. 1989), overruled on other grounds, Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089 (3d Cir. 1995); see also Haun v. Ideal Indus., Inc., 81 F.3d 541, 546 (5th Cir. 1996) (finding president's statement to personnel department that he did not want to hire older workers was sufficient to show company used age as a determinative factor in employment decisions generally); Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 449 (8th Cir. 1993) (stating that documents setting forth a company's overall direction and demonstrating a preference for youth cannot be characterized as "stray remarks" even when the documents are not directly related to the employment action). The evidence reflects that Kelley expressed a strong preference for a younger workforce and encouraged MGE's supervisors to use their firing powers to effectuate company objectives. Although Southern Union strongly denies that a preference for younger employees was stated, our review does not include an assessment of the credibility of witnesses. See Curtis v. Electronics & Space Corp., 113 F.3d 1498, 1502 (8th Cir. 1997). The jury was free to credit or discredit testimony as it believed appropriate, and it was for the jury to decide whose witnesses were telling the truth about Kelley's comments at the roundtable meetings. See id. Although Harbour testified that he never received an impression from Kelley that he should terminate older workers, an admission to the contrary would be unlikely in a discrimination case, and it was the jury's function to assess credibility and weigh the evidence. From the evidence presented, the jury reasonably could have inferred that Kelley's stated preference for younger employees motivated Harbour's decision to terminate Morse.

This inference that age motivated Harbour's decision to terminate Morse is strengthened by the events occurring between Morse's November 1995 review and his January 1996 termination. The November 1995 review outlining goals for the following year suggests that Harbour intended Morse to remain in his position for at least another year. Harbour's supervisor, Donald Kvapil, however, wrote on the review that immediate action should be taken by Morse to produce the operating

manual for the new computer system despite the explicit deadlines already set in the review for producing an outline (January 31, 1996) and a partial draft (March 31, 1996) of the manual. Furthermore, Kelley testified that he personally reviewed the performance evaluations of all supervisory-level employees. Shortly thereafter, Harbour made the decision to discharge Morse.

The weak showing made by Southern Union regarding its purported attempt to transfer Morse to another position also lends support to the jury's finding of intentional discrimination. Southern Union presented evidence that it tried to place Morse into another position but that no positions were available. The testimony of Harbour and the personnel director regarding the search for available positions was conflicting, and Harbour's testimony that he spoke to Jerry Fast, the manager of operations in Lee's Summit, regarding openings in Lee's Summit was directly contradicted by Fast. In addition, Fast testified that a position may have been available in Lee's Summit and there was also testimony that a lower-level position was available in the accounting department. Given the other evidence we already have discussed, the jury reasonably could have inferred that Southern Union discharged Morse because of his age.

Southern Union introduced evidence that its shift to a new computer system was initiated long before the roundtable meetings and that Morse's position was eliminated as a result of efficiencies created by the new computer system. Southern Union therefore asserted it had a non-discriminatory reason for its actions regarding Morse. Morse countered by presenting evidence that his job functions were not eliminated by the new system. He testified extensively about his job functions both before and after the conversion to the new system and stated that he worked with the new system every day. In addition, Morse testified that when he discussed Kelley's comments with Harbour during the November 1995 review, Harbour said that because of Morse's experience and knowledge in plant accounting he had nothing to worry about.

It was the jury's function to consider the competing evidence and the competing views of that evidence. The jury afforded greater credit to Morse's view of the facts in rendering its verdict and we cannot change the verdict simply because Southern Union presents a different view of the facts. See Glover v. McDonnell Douglas Corp., 981 F.2d 388, 392 (8th Cir. 1992), vacated on other grounds, 510 U.S. 802 (1993). Morse presented direct evidence of age animus and also presented evidence discrediting Southern Union's stated reasons for eliminating his position and terminating his employment. On this record, we cannot say the evidence is insufficient to support the jury's verdict that Southern Union intentionally discriminated against Morse because of his age. The District Court, therefore, did not err in denying Southern Union's motion for JAML.

B.

Southern Union also argues insufficient evidence supports the jury's punitive damages award. Under Missouri law, "'[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or reckless indifference to the rights of others.'" Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796, 803 (8th Cir. 1994) (quoting Burnett v. Griffith, 769 S.W.2d 780, 789 (Mo. 1989) (en banc)). The Missouri standard for punitive damages requires actual outrageousness, which is not present in the willfulness standard of the ADEA's liquidated damages provision, and can be satisfied by evidence that the defendant's conduct shocks the conscience and causes outrage. See id. at 803-04.

This Court has sustained a punitive damages award under the Missouri standard in a case with similar facts. In Denesha, the plaintiff's supervisor several times stated that older employees' work was inferior to that of younger employees and there was evidence that management held older employees to different standards than younger employees. We found that the quantum of outrageousness necessary to support a punitive damages award had been established because the actions of key

decision-makers permitted an inference of discriminatory animus on their part. See Denesha, 161 F.3d at 503-04; see also Kimzey, 107 F.3d at 576 (upholding punitive damages where supervisors harassed women and management repeatedly failed to investigate complaints or discipline offenders); Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1062 (8th Cir. 1993) (upholding punitive damages because management disciplined female employee differently than male employees for violating similar company rules, resulting in plaintiff's discharge); Finley v. Empiregas, Inc., 975 F.2d 467, 472 (8th Cir. 1992) (upholding punitive damages because employer had established policy of discriminating against women and knew policy was unlawful). In support of its argument that its conduct did not rise to the level of outrageousness necessary to support punitive damages, Southern Union cites Nelson, 26 F.3d at 804, and Glover, 981 F.2d at 396. Each of these cases, however, unlike the one before us, was a close case as to whether the plaintiff's evidence even was sufficient to support the jury's verdict on intentional discrimination.

Morse's evidence, credited by the jury, establishes that Southern Union's top management had stated a preference for a younger workforce and had reminded supervisors of their authority to fire employees to achieve company objectives. Consequently, the jury reasonably could have inferred that Harbour was carrying out company policy when he terminated Morse's employment. From the jury's verdict, it is obvious that the jury was outraged by Southern Union's actions, as was the District Court, which stated that it is "hard to imagine a much more flagrant violation of age protection laws." Morse v. Southern Union Co., No. 96-0719-CV-W-6, slip op. at 7 (W.D. Mo. Mar. 3, 1998). On this record, we cannot conclude that the evidence is insufficient to support the jury's finding that Southern Union's treatment of Morse was shocking and outrageous. Accordingly, the jury's finding that Morse is entitled to recover punitive damages must be sustained.[3]

---

[3]Southern Union also argues the evidence was insufficient to support the jury's verdict that it willfully violated the ADEA. The District Court did not award

III.

The District Court remitted the $450,000 compensatory damages award to $70,000 and the $6,250,000 punitive damages award to $400,000, yet Southern Union asserts that the remitted compensatory and punitive damages awards still are grossly excessive. We must consider whether the awards, as remitted by the District Court, are "so grossly excessive as to shock the court's conscience." Kientzy, 990 F.2d at 1061 (internal quotation omitted). We review the remitted awards for a clear abuse of discretion. See id. at 1062.

Southern Union cites cases approving compensatory awards for emotional distress in the range of $2000 to $35,000. See Ramsey v. American Air Filter Co., 772 F.2d 1303, 1313-14 (7th Cir. 1985); Carter v. Duncan-Huggins, Ltd., 727 F.2d 1225, 1238 (D.C. Cir. 1984); Block v. R.H. Macy & Co., 712 F.2d 1241, 1245 (8th Cir. 1983). A review of recent employment discrimination cases from this Circuit, however, reveals that we have upheld compensatory damages awards for emotional distress that are larger than the $70,000 awarded Morse. See Kim v. Nash Finch Co., 123 F.3d 1046, 1067 (8th Cir. 1997) ($100,000); Nelson, 26 F.3d at 802 ($74,811); Kientzy, 990 F.2d at 1061-62 ($150,000); Wilmington v. J.I. Case Co., 793 F.2d 909, 922 (8th Cir. 1986) ($400,000); cf. Delph v. Dr. Pepper Bottling Co., 130 F.3d 349, 357-58 (8th Cir. 1997) (reducing $150,000 compensatory damages award to $50,000 because emotional complaints were vague, ill-defined, and not intense). An expert in forensic psychology testified that in January 1997 he diagnosed Morse as suffering from major depression as a result of losing his job with Southern Union. Morse and his wife testified extensively about the emotional suffering Morse has endured since his employment suddenly was terminated after thirty-two years with the company.

liquidated damages under the ADEA and Morse has conceded that the "jury's finding of a willful violation of the ADEA is therefore only relevant if the Court should rule that punitive damages were not properly awarded." Appellee's Brief at 24 n.6. Because this opinion upholds the award of punitive damages, we need not address this issue. See supra, Part II.B., and infra, Part III.

In light of prior cases and Morse's evidence, we cannot say that $70,000 in compensatory damages is grossly excessive, and, therefore, the District Court did not abuse its discretion in remitting the compensatory damages award to $70,000.

Southern Union also argues that the punitive damages award is grossly excessive and should be remitted further. Missouri does not have a set limit on punitive awards, but requires both the trial court and the appellate court to review the jury's punitive damages award to ensure that it is not an abuse of discretion. See Kimzey, 107 F.3d at 576. Factors to consider in determining if the punitive damages award is fair and reasonable include: "the degree of malice or outrageousness of the defendant's conduct, aggravating and mitigating circumstances, the defendant's financial status, the character of both parties, the injury suffered, the defendant's standing or intelligence, and the relationship between the two parties." Id. (citing Call v. Heard, 925 S.W.2d 840, 849 (Mo. 1996) (en banc), cert. denied, 519 U.S. 1093 (1997)). Morse's evidence, which the jury credited, shows that Southern Union's top management expressed a preference for younger workers while challenging its supervisors to exercise their firing powers to achieve company objectives. Such age-based animus in top management likely may affect other employees of the company. The award of $400,000 is less than one one-thousandth of Southern Union's approximately $500,000,000 net worth and the ratio of punitive to compensatory damages (not including the separate awards of back pay and front pay) is less than 6:1, a ratio that in these circumstances does not set off any alarm bells. We have approved large punitive damages awards in the past to deter employment discrimination. See Denesha, 161 F.3d at 504 ($700,000); EEOC v. HBE Corp., 135 F.3d 543, 556-57 (8th Cir. 1998) ($380,000 and $100,000); Kim, 123 F.3d at 1067 ( $300,000); Kimzey, 107 F.3d at 576-78 ($350,000); Kientzy, 990 F.2d at 1062 ($400,000). The punitive damages awarded here cannot be considered so excessive as to shock the Court's conscience. We also do not find the remitted punitive damages award to be unconstitutionally excessive so as to violate the Due Process Clause of the Fourteenth Amendment. See BMW of N. Am., Inc. v. Gore,

517 U.S. 559, 575 (1996) (standard). We cannot say the District Court abused its discretion in remitting the punitive damages award to $400,000.

IV.

Southern Union argues that the District Court abused its discretion by denying Southern Union's motion for a new trial based on several alleged instructional errors. A district court has broad discretion in instructing the jury, and jury instructions "do not need to be technically perfect or even a model of clarity." Cross v. Cleaver, 142 F.3d 1059, 1067 (8th Cir. 1998). When an instructional error has been properly preserved for appeal, we review for abuse of discretion and we "must determine simply 'whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury.'" Kim, 123 F.3d at 1057 (quoting Karcher v. Emerson Elec. Co., 94 F.3d 502, 510 (8th Cir. 1996), cert. denied, 520 U.S. 1210 (1997)).

To properly preserve a claim of instructional error, a party must make a sufficiently precise objection before the district court and propose an alternate instruction. See Nelson v. Ford Motor Co., 150 F.3d 905, 907 (8th Cir. 1998); Kehoe v. Anheuser-Busch, Inc., 96 F.3d 1095, 1104 (8th Cir. 1996). If the instructional error has not been preserved, the claim is waived and we review the district court's instructions only for plain error. See Kehoe, 96 F.3d at 1104. Under plain error review, we reverse "only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected." Cross, 142 F.3d at 1068 (internal quotations omitted). Plain error review is "narrow and confined to the exceptional case where error has seriously affected the fairness, integrity, or public reputation of the judicial proceedings." Ryther, 108 F.3d at 847 (internal quotation omitted).

A.

The first claim of instructional error raised by Southern Union alleges the jury was improperly instructed on the standard for awarding punitive damages under the MHRA. The jury instruction stated that a preponderance of the evidence was required. The Missouri Supreme Court has held that a plaintiff seeking punitive damages under the common law must establish by clear and convincing evidence that the defendant's conduct was outrageous. See Rodriguez v. Suzuki Motor Corp, 936 S.W.2d 104, 111 (Mo. 1996) (en banc). The parties, however, did not object to this aspect of the submitted instruction. The claim therefore is waived and we review only for plain error.

Assuming, without deciding, that the jury instruction incorrectly stated the legal standard for punitive damages under the MHRA, the error does not reach the level required for reversal under plain error review. Because neither party objected to the instruction, the error was invited by the parties. The District Court was "positive that any instructional error was harmless, given the amount of the award and the evidence of outrageous conduct." Morse, No. 96-0719-CV-W-6, slip op. at 8. We agree. This error did not seriously affect the fairness of the trial, its integrity, or its public reputation. See Baker v. Delo, 38 F.3d 1024, 1026 (8th Cir. 1994) (finding no plain error when instruction stated incorrect legal standard); Turner v. White, 980 F.2d 1180, 1182 (8th Cir. 1992) (same). The error also did not prejudice the substantial rights of Southern Union nor would a miscarriage of justice result if this error were left uncorrected. We find no plain error in this jury instruction.

B.

For its second claim of instructional error, Southern Union argues that the special verdict form improperly instructed the jury that it could find for Morse if it disbelieved Southern Union's proffered reason for discharge, without any finding that

-13-

the real reason was age discrimination. Southern Union did not object to this portion of the instructions nor did it offer an alternate instruction;[4] therefore, we find Southern Union did not properly preserve this issue for appeal and review only for plain error. Having considered this issue, and having examined the entire instruction, we conclude that any error in the instruction does not rise to the level of plain error and thus does not amount to a reason for reversal. We are satisfied the jury was adequately informed that in order to return a verdict for Morse it would have to find from the evidence, not only that the defendant's stated reasons for its decision were not the true reasons, but also that the real reason for the defendant's decision was intentional discrimination on account of Morse's age. See Ryther, 108 F.3d at 837-38; Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1334-37 (8th Cir. 1996).

## C.

Southern Union's other claims of instructional error do not warrant discussion. Having carefully considered them, we conclude they are entirely lacking in merit.

## V.

Southern Union argues the District Court abused its discretion in awarding front pay.[5] Under the ADEA, the District Court had discretion to shape a remedy to compensate Morse for what was lost on account of the age discrimination, but it could not reject or contradict the jury's findings in doing so. See Curtis, 113 F.3d at

---

[4]After trial, Southern Union submitted the affidavit of one of its attorneys stating that an objection was made to this instruction off the record. The District Court was satisfied that the point was not expressed on or off the record. Even assuming the argument was made, it was Southern Union's responsibility to make its objection and propose an alternate instruction on the record.

[5]The parties stipulated that the present value of front pay until Morse reaches age sixty-two is $86,456. Southern Union reserved the right to dispute its liability for front pay.

-14-

1503-04. The District Court was required to presume Morse would have worked at Southern Union until he retired, unless Southern Union provided evidence to the contrary. See Neufeld v. Searle Lab., 884 F.2d 335, 341 (8th Cir. 1989). Southern Union argues Morse could not have continued working at the company because his position was eliminated for business reasons, but the jury specifically rejected this argument. In addition, the jury's verdict awarding back pay establishes that Morse would not have been discharged prior to the date of the verdict absent age discrimination. See Curtis, 113 F.3d at 1504. The evidence shows that Morse had performed numerous jobs with the company and was capable of working for the company in other capacities if and when his plant accounting position was eliminated for a nondiscriminatory reason. See id. at 1505. The somewhat conflicting testimony of Harbour and the personnel director regarding the lack of available positions was countered by the testimony of Jerry Fast that a position may have been available in the Lee's Summit office and by evidence of an opening in the accounting department. The District Court did not abuse its discretion in awarding front pay.

## VI.

For the foregoing reasons, the judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-15-